In the Matter of Arthur Clarke AHLSWEDE and Dorothy Ahlswede, Bankrupts.

Richard W. STEBBINS, Trustee, Appellant,

v.

CROCKER CITIZENS NATIONAL BANK, Appellee.

No. 73–2506.

United States Court of Appeals, Ninth Circuit.

April 29, 1975.

Bruce D. Roberts (argued), Reno, Nev., for appellant.

Richard R. Clements (argued), Los Angeles, Cal., for appellee.

## OPINION

Before CHAMBERS, KOELSCH and KILKENNY, Circuit Judges.

KOELSCH, Circuit Judge:

This case presents a unique question regarding the extent of a bankruptcy court's equitable power to subordinate a creditor's claim against the bankruptcy estate.

Bankrupt is one of four beneficiaries of a so-called "spend-thrift" trust created inter vivos by his father. The trust instrument provides that "[t]he interests of all beneficiaries other than the Trustor in principal or income shall not be subject to claims of their creditors or others nor to legal process and may not be voluntary [*sic*] or involuntary [*sic*] alienated or encumbered." The trust situs is California; California law enforces such trust provisions. *See* Kelly v. Kelly, 11 Cal.2d 356, 79 P.2d 1059 (1938); Cal.Civ.Code § 867. *But see* Cal.Civ. Code § 859; II Scott on Trusts § 152.1, at 1143 and n.21 (3d ed. 1967); Comment, Trusts: Spendthrift Trusts in California: Civil Code Sections 859 and 867: Planning and Construction of Spendthrift Provisions, 40 Cal.L.Rev. 441, 442 (1952). The effect of the trust provision is that upon the bankruptcy of the beneficiary his equitable interest in the income and principal of the trust estate, being non-assignable and immune from judicial process under California law, does not pass to the trustee of the bankruptcy estate, under Section 70(a)(5) of the Bankruptcy Act, 11 U.S.C. § 110(a)(5), and title remains in the trustee of the spendthrift trust.[1] *See* 4A Collier on Bankruptcy ¶ 70.26, at 364–71 (rev.ed.1971); Restatement of Trusts 2d §§ 149, 152 (1959); Danning v. Lederer, 232 F.2d 610 (7th Cir. 1956); Scott, *supra,* § 152.2, at 1150–51.

The claimant in this bankruptcy proceeding is the Crocker National Bank (Bank), the trustee of the bankrupt's spendthrift trust, claiming on behalf of the trust. The Bank's claim derives from a number of promissory notes, held as assets of the trust, evidencing loans made to the bankrupt at various times either by his father or the Bank, and now due the trust.

The trust instrument sets up a plan for equal periodic distributions of the income and principal of the trust to the four beneficiaries. It also provides that if a beneficiary is indebted to the trust when a distribution is scheduled, his distributive portion must first be used to offset his indebtedness. All of the bankrupt's shares of trust income and principal have heretofore been applied to discharge his obligations to the trust, and several distributions remain to be made.

However, in this proceeding the Bank seeks to have the remaining indebtedness immediately discharged (insofar as possible) by allowing the trust to share in the bankruptcy estate on a parity with the general creditors. The ultimate effect of such a recovery by the Bank for the trust will be, of course, that the bankrupt's obligations to the trust will be diminished by reducing the shares going to general creditors, and the share of the trust which the bankrupt will ultimately receive will increase.

The trustee in bankruptcy objected to the claim, but the referee allowed it as provable, apparently concluding that the notes reflected bona fide debts rather than anticipatory distributions of the bankrupt's share of the trust estate.[2] However, the referee subordinated the Bank's claim to those of the other creditors. The referee justified his exercise of his general equitable powers on the rationale that it was unfair that the spendthrift trust should insulate the bankrupt's beneficial interest in the trust from the general creditors but that the trust should share with the creditors in the bankrupt's other assets, thereafter distributing assets in an equivalent

---

1. Naturally, the beneficiary's portion of the trust not exempted under Cal.Civ.Code § 859 would vest by operation of law in the trustee. *See* Scott, *supra,* at 1151. *See* Matter of Irving Trust Co., 267 N.Y. 102, 195 N.E. 811 (1935). Here, the trustee in bankruptcy, under a stipulated set of facts, has not sought to claim any of the assets in the spendthrift trust, and presumably the beneficiary's share of the estate is entirely exempted by § 859.

2. If there were never an intent that the loans be repaid, there would be no debt and hence the issue of subordination would not be raised. The situation is analogous to that involved in distinguishing between a "loan" and a capital contribution made to a controlled corporation. *See* A. Herzog & J. Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 93 (1961).

amount to the bankrupt free of the creditor's claims.[3]

On review, the district court reversed, holding that under the circumstances the Bankruptcy Act permits the Bank to share equally with the other unsecured general creditors, and that the referee lacked cognizable equitable grounds for subordinating the claim. We agree.

■ The trustee quite properly concedes that, despite the fact that the trust's claim against the bankrupt is to some extent[4] secured by his distributive share of the trust, the Bank's claim was properly filed as an unsecured claim. The Bankruptcy Act defines a secured creditor as one "who has security for his debt upon the property of the bankrupt of a nature to be assignable under this title" (11 U.S.C. § 1(28)). The bankrupt's interest in the trust is not assignable and not part of the bankruptcy estate; consequently the trust's claim is not secured within the meaning of the Act, and the Bank may file its claim as unsecured. Ivanhoe Bldg. Assn. v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419 (1935).

The remaining question therefore is whether the referee could subordinate the Bank's claim (undoubtedly thereby defeating it).

■ Subordination is an equitable power. We recognize the principle that a bankruptcy court is a court of equity, charged to apply equitable principles to reach equitable results when administering the Bankruptcy Act. In doing so, the bankruptcy "chancellor" may disregard form for substance and alter the result which would obtain under a formal application of general legal principles, in order to do equity. Pepper v.

Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ Nevertheless, the bankruptcy court's power to impose a result different from that prescribed by the statutory distribution scheme is not unlimited. The standard is that "[a claim's] disallowance or subordination may be necessitated by certain cardinal principles of equit[able] jurisprudence." Pepper v. Litton, supra, at 306, 60 S.Ct. at 245. In defining the nebulous "cardinal principles of equitable jurisprudence," it is important to keep in mind that the chancellor never did, and does not now, exercise unrestricted power to contradict statutory or common law when he feels a fairer result may be obtained by application of a different rule. Courts of equity have long applied standards of conscience to conduct on an individual basis to prevent formally proper but unconscionable applications of legal rules; they have not engaged in the practice of making abstract legislative judgments about the fairness of a result contemplated by the legislature's statutory scheme if it has otherwise been followed in good faith and without overreaching. See Colonial Trust Co. v. Goggin, 230 F.2d 634, 636–37 (9th Cir. 1955). As Maitland put it:

> "[W]e ought to think of equity as supplementary law, a sort of appendix added on to our code, or a sort of gloss written round our code, an appendix, a gloss, which used to be administered by courts specially designed for that purpose, but which is now administered by the High Court of Justice as part of the code. The language which equity held to law, if we may personify the two, was not 'No, that is not so, you make a mistake, your rule is an absurd, an obsolete one'; but 'Yes, of

3. The referee ruled that he had no power to impose a constructive trust for the benefit of the general creditors to recoup amounts paid the Bank out of the bankrupt's subsequently acquired distributive shares. That ruling was not challenged.

4. It is unclear from the record whether or not the distributive portion of the trust remaining

as the bankrupt's share is larger or smaller than his remaining indebtedness. Aside from the possibility that the trust is insecure on that basis, there is always the possibility of a decline in the value of the trust assets. And in the event of the bankrupt's death, the trust provides for a gift over to his heirs which quite plausibly could defeat the trust's recovery under the language of the trust instrument.

course that is so, but it is not the whole truth.' "
Maitland, Equity; A Course of Lectures 18 (1936). Here, the referee in effect said, "No, the distribution scheme provided by the Act is a mistake, the rules of spendthrift trusts and the definition of a secured creditor are absurd and obsolete," and reached a different result.

■ Whatever the validity of the referee's judgment on the merits of the statutes, a trio of Supreme Court cases dealing with subordination in a closely analogous situation makes clear that he was without power to impose it. In the three mentioned cases the Court indicated that before a bankruptcy court may disallow or subordinate a claim, some basis must exist of the sort traditionally cognizable by equity as justifying its intervention, such as fraud, breach of fiduciary duties, mismanagement, overreaching; in fact, any breach of the multitude of "rules of fair play and good conscience" (Pepper v. Litton, *supra*, 308 U.S. at 310, 60 S.Ct. at 247) traditionally enforced by a court of equity will suffice. A supposed inequity resulting when an innocent party in good faith asserts a legally valid claim will not. Comstock v. Group of Institutional Investors, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 911 (1948).

In the first two cases of the trilogy, Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) (The Deep Rock Case), and Pepper v. Litton, *supra*, the Court subordinated the claims against the controlled corporation, but in each the controlling party engaged in a course of conduct which made it inequitable for it to share in the bankruptcy estate on a par with the other creditors. In *Taylor* the controlling corporation dominated, mismanaged, and plundered the subsidiary to its own benefit and to the detriment of minority shareholders and creditors of the subsidiary to whom it owed fiduciary duties. In *Pepper* the controlling stockholder engaged in an intentional and blatant effort to manipulate corporate forms to avoid the claim of a creditor. In the third case, *Comstock*, on the other hand, both the district court and the court of appeals concluded that the controlling corporation had managed the subsidiary in good faith and fairly and that the corporation's failure was due to unavoidable business reasons. The Court accepted those findings and held that the parent's claim was properly not subordinated—thereby allowing the parent corporation to enjoy the benefits of its legally distinct corporate entity and in essence, as here, to file a claim against itself to the detriment of other creditors. Compare Comstock, *supra*, 335 U.S. at 229–30, 68 S.Ct. 1454, with Comstock, *supra*, 335 U.S. at 237–39, 68 S.Ct. 1454 (Murphy, J., dissenting). *See* Prudence Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293 (1942); Frasher v. Robinson, 458 F.2d 492 (9th Cir. 1972). *See* A. Herzog & J. Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 108 (1961).

■■ Thus, there must be conduct either in acquiring or asserting the claim which is itself inequitable in order to subordinate a claim. Nothing here suggests that inequitable conduct underlies the claims asserted by the Bank. Certainly there is no equitably cognizable overreaching in the Bank's assertion of those claims in the bankruptcy proceeding; the Bank would probably breach its trust to the trust's other beneficiaries if it failed to seek payment of the loans from the bankruptcy estate. (*See* n.4 *supra*.) The parties have not suggested that the trust was either established or administered improperly or with a purpose to prejudice the general creditors, or that the bankrupt's debts to the trust are other than a reflection of good faith business loans. That being the case, the district court properly held that the referee lacked a basis for subordinating the Bank's claim.

As the district court noted, the supposed unfairness here results entirely from the provisions of state law recognizing spendthrift trusts and from the provisions of the Bankruptcy Act giving such trusts effect in bankruptcy proceedings.

The Bankruptcy Act advances a number of sometimes conflicting policies. One, of course, is to secure on an equitable basis as much as possible for the general creditors damaged by the bankruptcy. Another, however, is to give the bankrupt a fresh start, allowing him as of the date of cleavage to apply his assets to discharge his indebtedness and receive anything thereafter free of the claims of creditors. That is what happened here— the general creditors are no worse off when the Bank Trust department collects its claim against the bankrupt from his assets in the bankruptcy estate than they would be had the notes been payable to another bank (in which case there would be no thought of subordination). The fact that the bankrupt may later receive distributions from the trust, and that the Bank need not collect the debt from the distributive shares, is simply a product of the fact that except for statutorily defined exceptions the Bankruptcy Act dictates that property acquired after the date of cleavage goes to the bankrupt, and that under state law he does not obtain his trust property until the dates set for distribution. *See* Collier, *supra,* ¶ 70.26, at 372, ¶ 70.09, at 103 et seq.; Frazier v. Wasserman, 263 Cal.2d 120, 69 Cal.Rptr. 510, 514 (1968). In short, in some circumstances the Bankruptcy Act allows a bankrupt to enjoy his fresh start in life with a silver spoon in his mouth.

The trustee's real complaint here is ultimately with the fact that California law allows property to be tied up in such a manner that the beneficiary may enjoy the benefits of that property without having his interest in that property alienated or burdened to discharge his responsibilities to his creditors. The effects of restraints against alienation have been criticized for centuries; nevertheless, they persist. *See Scott, supra,* at § 152. Apparently the California legislature saw some value in allowing spendthrift trusts, and the Congress saw some value in providing for enforcement of state rules of property law. A court is not free, in the name of equity, to override those judgments.

The only other possible basis for subordinating the Bank's claim, the doctrine of marshaling of assets, is clearly foreclosed in the situation here presented under the doctrine of Meyer v. United States, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963), which is virtually on all fours.[5]

Affirmed.

---

5. Moreover, ordinarily a party will not be relegated, under the doctrine of marshaling, to one of two funds if recovery from that fund is uncertain. Victor Gruen Associates, Inc. v. Glass, 338 F.2d 826 (9th Cir. 1964). Here, the trust's recovery from the beneficiary's distributive share imposes on it some risk of loss. *See* n.4 *supra.*