In the Matter of MOBILE STEEL COMPANY, Debtor.

Elaine E. BENJAMIN et al., Appellants,

v.

Lester Y. DIAMOND, as Trustee in Bankruptcy for Mobile Steel, Inc., Appellee.

No. 75–4195.

United States Court of Appeals, Fifth Circuit.

Nov. 21, 1977.

I. David Cherniak, J. Don Foster, Mobile, Ala., for appellants.

Herbert P. Feibelman, Jr., Mobile, Ala., for appellee.

Before GODBOLD and CLARK, Circuit Judges, and HOFFMAN,* District Judge:

CLARK, Circuit Judge:

The appellants are organizers, officers, and directors of the bankrupt, the Mobile Steel Company, Inc. [Mobile Steel], members of their immediate families, and a corporation which one of them controls. They attack the district court's affirmance of the bankruptcy judge's decision to subordinate some of their claims against the bankrupt estate to those asserted by other unsecured creditors, and to disallow some that were not subordinated. The principal question presented is whether the claimants violated the "rules of fair play and good conscience" [1] in their dealings with the corporation and its creditors, and in their manage-

* Senior District Judge of the Eastern District of Virginia, sitting by designation.

1. *Pepper v. Litton*, 308 U.S. 295, 310, 60 S.Ct. 238, 247, 84 L.Ed. 281, 291 (1939).

2. 

| Claim No. | Claimant | Amount of Claim |
|---|---|---|
| 17 | Elaine E. Benjamin, as Trustee for Alan H. Benjamin | 17,850.00 |
| 18 | Elaine E. Benjamin, as Trustee for Frederick S. Benjamin | 17,850.00 |
| 19 | Elaine E. Benjamin, as Trustee for Stuart W. Benjamin | 17,850.00 |
| 20 | Harvey L. Benjamin | 39,746.30 |
| 21 | Harvey L. Benjamin | 1,500.00 |
| 23 | Dwight-Tumlin Consultants, Inc. | 39,746.30 |
| 24 | Ernest H. Woods | 39,746.30 |
| 26 | William E. Woods | 11,900.00 |
| 27 | William E. Woods, as Trustee for Vivian Elaine Woods Stevens | 11,900.00 |

ment of corporate affairs. We hold that they did not.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Proceedings Below

The claims at issue in this case [2] were filed during proceedings conducted under Chapter XI of the Bankruptcy Act, 11 U.S. C.A. §§ 701 *et seq.* (1970), and challenged by the trustee, Lester Y. Diamond. For the purpose of analysis the claims may be divided into two groups. The first group, Claim Nos. 17–19, 26, and 27, consists of claims based upon the debentures issued to all but one of the appellants by Mobile Steel's predecessor, the E.B.F. Company, Inc. [E.B. F.], on the day after its incorporation. The second group, Claim Nos. 20, 23 and 24, is comprised of claims arising from promissory notes given to three of the appellants by Mobile Steel in exchange for some commercial property located in Savannah, Georgia. The bankruptcy judge disallowed the first group of claims on the ground that the consideration which the appellants had given in exchange for the debentures was a contribution to capital rather than a loan.[3]

Elaine Benjamin is the wife of Harvey L. Benjamin, and Alan, Frederick, and Stuart are their sons. William E. Woods and Vivian Elaine Woods Stevens are the son and daughter, respectively, of Ernest H. Woods. The bankruptcy judge found that Benjamin's wife, and the trusts created for their children's benefit, were alter egos of Benjamin, that Woods' son and the trust created for his daughter's benefit were alter egos of Woods, and that Dwight-Tumlin Consultants, Inc. [Dwight-Tumlin] was an alter ego of Frank A. Plummer, and therefore refused to treat them as independent creditors. Although there is no evidence in the record on this point, we assume, solely for the purpose of deciding this case, that his conclusion is correct.

3. The bankruptcy judge also disallowed two other claims. He rejected Claim No. 21, which was based on an alleged loan from Benjamin to Mobile Steel, on the ground that there was no evidence that the loan had been made. Benjamin has abandoned his challenge to the correctness of that ruling. Claim No. 23, one of the second group of claims, was disallowed because Dwight-Tumlin had neglected to intro-

He subordinated Claim Nos. 20 and 24 of the second group to the claims asserted by other unsecured creditors because he concluded that the appellants had failed to demonstrate that they had properly performed their fiduciary duties and acted in good faith toward Mobile Steel and its creditors in arranging for Mobile Steel to purchase the Georgia property from a partnership which they controlled at a time when Mobile Steel was in precarious financial condition. The district court affirmed the bankruptcy judge's decision without opinion. This appeal followed.

## B. The Origin of the Mobile Steel Company and the Issuance of the Corporate Debentures

On February 18, 1965, Harvey L. Benjamin [Benjamin], Ernest H. Woods [Woods],[4] and Frank A. Plummer [Plummer], formed E.B.F. Its authorized capital consisted of 37,500 shares of $10 par value common stock ($375,000.00) and 1,250 shares of $100 par value preferred stock ($125,000). Initial subscriptions for 12,500 shares of common stock ($125,000.00) and all 1,250 shares of the preferred ($125,000.00) produced a paid in capital of $250,000.00.

E.B.F.'s officers and directors included Benjamin (Director, President, and Treasurer), Ernest Woods (Director and Chairman of the Board), Plummer (Director), and William Woods (Secretary). They owned E.B.F.'s capital stock in the following proportions: Benjamin (20%), Benjamin's wife Elaine (20%), Woods (0.62%), Woods' son William (17.2%), the Lynspen Company (17.2%),[5] and Plummer (24.98%). The Board of Directors authorized E.B.F. to purchase the assets of the Mobile Steel Company, Inc. [old Mobile Steel], except for the cash surrender value of life insurance policies on two principal officers, and to assume most of its liabilities. For the stated purpose of improving "the cash position of the corporation" and "thus . . . its credit rating," the Board also approved a proposal that E.B.F. issue 100 debentures, each with a face value of $2,500.00 ($250,000), bearing 6% interest payable bi-annually, and maturing ten years from March 1, 1965. As soon as this resolution was passed Benjamin, Woods, and Plummer offered to "loan and advance" E.B.F. $250,000.00 in exchange for the debentures. The Board voted to accept their offer, and the debentures were issued to them and their designees.[6]

A few days after its incorporation E.B.F. purchased old Mobile Steel for approximately $1.2 million. It combined a bank loan of $650,000, secured by a mortgage on the real property transferred, all $250,000 of its paid in capital, and the $250,000 obtained from the issuance of the debentures to finance the acquisition. On Febru-

---

duce into evidence the promissory note on which it was based. After this deficiency was remedied, the district court modified the bankruptcy judge's order by rescinding the disallowance, and elevated Claim No. 23 to the subordinated status of the other claims in the second group.

4. Woods died while the Chapter XI proceeding was still pending, and his interests are now represented by his widow, Marie, in her capacity as executrix of his estate.

5. The bankruptcy judge referred to the Lynspen Company as a Woods "interest."

6.

| Name | Number of Debentures | Aggregate Face Value |
|---|---|---|
| Harvey L. Benjamin | 55 | 55,000.00 |
| Elaine E. Benjamin, as Trustee for Frederick Scott Benjamin | 15 | 15,000.00 |
| Elaine E. Benjamin, as Trustee for Stuart Wayne Benjamin | 15 | 15,000.00 |
| Elaine E. Benjamin as Trustee for Alan Howard Benjamin | 15 | 15,000.00 |
| Frank A. Plummer | 62.5 | 62,500.00 |
| Ernest H. Woods | 1.5 | 1,500.00 |
| Lynspen Company | 43 | 43,000.00 |
| William E. Woods | 43 | 43,000.00 |
| Totals | 250 | $250,000.00 |

ary 23, E.B.F. changed its corporate name to "Mobile Steel Company, Inc.," and the bankrupt was born. Because the purchase of the assets of old Mobile Steel had consumed all of the new company's cash, it borrowed $822,893.52 from James Talcot, Inc., to serve as operating capital, pledging its trade accounts receivable and inventories as collateral.

Within two years of its date of incorporation Mobile Steel acquired two subsidiaries that were destined to play an important role in the course of events we must explore. The first is the McGowin-Lyons Hardware & Supply Company, Inc. [McGowin-Lyons], which Mobile Steel purchased on October 29, 1965. The significance of the McGowin-Lyons acquisition is twofold. First, McGowin-Lyons later bought $185,000 worth of the Mobile Steel debentures from the appellants. When the subsidiary was dissolved on April 6, 1968, the bankrupt's obligation to repay these bonds was extinguished. The remaining $65,000 worth of debentures are still outstanding and constitute the basis of Claim Nos. 17–19, 26, and 27. Second, on December 8, 1966, McGowin-Lyons received $400,-000.00 from the sale of property under threat of imminent condemnation. The opportunity afforded by Section 1033 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1033 (1967) to avoid recognition of the $378,750.00 capital gain resulting from the transaction through a reinvestment in similar property which had been preserved until December 31, 1969 by extensions, passed to Mobile Steel upon McGowin-Lyons' dissolution. The existence of this potential tax benefit forms a part of the context of the bankrupt's subsequent decision to purchase the Georgia property.

Mobile Steel acquired a second subsidiary, the Jones & Armstrong Steel Company, Inc. [Jones & Armstrong], on November 9, 1966. Jones & Armstrong is important primarily because of its involvement in the transfers of the Georgia property.

C. Mobile Steel's Purchase and Resale of the Georgia Property

About 1967,[7] Benjamin, Tumlin & Woods, a partnership comprised of Benjamin, Woods, and Dwight-Tumlin, purchased some commercial property (including land, improvements, machinery, and equipment) located in Savannah, Georgia, at a bankruptcy sale. Although the partnership had originally offered the Trustee $250,000, and the realty and improvements alone had recently been appraised at $210,700.00, the price it paid was $200,000.00.[8] In order to finance its purchase, the partnership borrowed $200,000 from the Citizens & Southern National Bank, giving in exchange a note secured by a first mortgage on the property. The partnership then leased the property to Jones & Armstrong, which had agreed to guarantee payment of the partnership's note.

Shortly after McGowin-Lyons had realized the $378,750.00 capital gain, Mobile Steel began to search for a suitable piece of similar property in which it could reinvest the proceeds of the sale, thereby deferring recognition of the capital gain. Although it succeeded in finding four such parcels, their aggregate purchase price amounted to only $23,655.00, obviously far less than what was needed. Negotiations for the purchase of other larger pieces of property fell through because Mobile Steel was unable to obtain the necessary financing. As the deadline for reinvestment, December 31, 1969, drew near, the partnership agreed to sell the

---

7. The precise date of the sale does not appear in the record, and in view of the inconsistent testimony he received on the issue, the bankruptcy judge declined to make a finding of fact on this point. We assume that the sale was consummated during 1967 because the mortgage on the property given to the bank which financed the sale by the partnership to secure its promissory note is dated June 20, 1967.

8. This figure, like many others pertaining to the transactions involving the Georgia property, must be regarded as an approximation because none of the original documents they generated were introduced into evidence. The mist of uncertainty which engulfs these events is not dispelled by either the briefs or by the testimony offered at the hearing held before the bankruptcy judge on the trustee's objections.

Georgia property to the bankrupt. Mobile Steel's Board of Directors authorized the purchase on December 19, 1969. The terms of the transaction were as follows. The total purchase price was $236,364.83. Of this $210,700.00 was allocated to the real estate. In payment of this amount Mobile Steel assumed the partnership's undischarged indebtedness to the bank of $123,342.16 and gave the partnership two promissory notes, secured by a second mortgage on the land, totalling $87,357.84 which were to mature in ten years and bear annual interest of 6%. The remaining $25,664.83 of the purchase price was allocated to the machinery and equipment located on the property. In order to cover this amount, Mobile Steel gave the partnership a third ten-year promissory note, secured by a second mortgage on the machinery and equipment, also bearing interest at the rate of 6% annually. The partnership did not request a downpayment, and no cash changed hands. Benjamin testified that this was because "we [the partnership] felt that Mobile Steel did not have or could not take that money out of their operating assets at that time."

Shortly after the purchase was consummated, Mobile Steel entered into negotiations with the Ingalls Iron Works Company [Ingalls] in an attempt to arrange for the sale of Jones & Armstrong to Ingalls. The talks culminated in Ingalls agreement to purchase Jones & Armstrong, and the necessary documents were executed on November 30, 1970. Under the terms of the sale Ingalls agreed to pay Mobile Steel $600,000. In exchange Ingalls received, among other things: (1) all of the outstanding common stock of Jones & Armstrong; (2) Mobile Steel's agreement to transfer the Georgia property (chattels and realty) to Jones & Armstrong free of any encumbrances as consideration for the cancellation of an account receivable due to Jones & Armstrong from Mobile Steel in the amount of $232,912.00, and (3) the partnership's abrogation of its security interest in the Georgia

property (an unrecorded second mortgage). When Mobile Steel conveyed the Georgia property to Ingalls the partnership surrendered the notes which the bankrupt had issued to them, and, upon its dissolution, Mobile Steel issued new promissory notes in the amount of $39,746.30 to each of the parties individually.[9] These notes form the basis for Claim Nos. 20, 23, and 24.

D. The Demise of the Mobile Steel Company

Although Mobile Steel realized modest profits in its initial years of operation, and managed to maintain a steady sales record, it slipped into a precipitous financial decline shortly thereafter. By the close of 1969, the trend had become irreversible. The corporation's net income plummeted from a high of nearly $80,000 in 1965 to a deficit of nearly $500,000 in 1969, and, by the end of 1969 its ratio of total debt to stockholder equity was approaching 17:1. Creditors were beginning to restrict Mobile Steel's accounts. While the corporate records for 1970 are fragmentary, it is apparent that the company's overall financial position continued to deteriorate after the purchase and resale of the Georgia property. On February 26, 1971, Mobile Steel filed a voluntary petition under Chapter XI.

II. THE POWER OF EQUITABLE SUBORDINATION AND ITS LIMITS

▮ Equality of distribution is the underlying theme of the Bankruptcy Act. *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23, 29 (1952); *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298 (1941); see Section 65a of the Bankruptcy Act, 11 U.S.C.A. § 105(a) (1953). But the rule of per centum dispensation of assets is not inexorable. Although nothing in the Bankruptcy Act expressly authorizes departures from strict equality, bankruptcy courts have traditionally been

---

**9.** The difference between the sum of these notes, $119,238.90 and the amount of the notes issued to the partnership by Mobile Steel at the time the bankrupt purchased the property,

$113,022.67, represents the amount of interest, $6,216.23, calculated as agreed at 6% annually, that had accrued since the original notes were issued to the partnership 11 months earlier.

regarded as courts of equity, *see Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, 1232 (1934); *Corley v. Cozart,* 115 F.2d 119, 121 (5th Cir. 1940), and it is settled that they possess the power "to prevent the consummation of a course of conduct by [a] claimant which . . . would be fraudulent or otherwise inequitable" by subordinating his claims to the ethically superior claims asserted by other creditors. *Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970, 976 (1946); *accord, Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281, 287–288 (1939); *DeMet v. Harralson,* 399 F.2d 35, 38 (5th Cir. 1968).

■ · The two most frequently mentioned sources of legislative support for the exercise of equitable jurisdiction by bankruptcy courts are (i) Section 2a of the Bankruptcy Act, 11 U.S.C.A. § 11(a) (1953) (investing the bankruptcy courts "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction under [the Bankruptcy Act]") and (ii) Section 57k, 11 U.S.C.A. § 93(k) (1953) (authorizing the bankruptcy court to reconsider previously allowed claims and to reallow or disallow them "according to the equities of the case"). *See Pepper v. Litton,* 308 U.S. at 304–05, 60 S.Ct. at 244, 84 L.Ed. at 287–288. The force of the argument based on Section 57k was diminished by the issuance of Rule 307 of the Rules of Bankruptcy Procedure. Rule 307 superseded Section 57k, and makes no reference to "equities" or "equitable considerations." Nevertheless, we assume that the equitable jurisprudence of the bankruptcy courts persists. *See In re Branding Iron Steak House,* 536 F.2d 299, 301 (9th Cir. 1976). The statute under which the

Rules were issued provides in part: "Such rules [of bankruptcy procedure] shall not abridge, enlarge, or modify any substantive right." 28 U.S.C.A. § 2075 (Supp. 1977), *quoted in* Advisory Committee's Introductory Note to the Preliminary Draft of the Rules of Bankruptcy Procedure, *reprinted in* 2 L. King, Bankruptcy Act and Rules 757 (Collier Pamphlet Ed. 1975). Accordingly, there is a strong presumption that no such change was intended. *In re Wall,* 403 F.Supp. 357, 360 (E.D.Ark.1975).

■ The prerogative to relegate claims to inferior status on equitable grounds, though broad, *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. at 219, 61 S.Ct. at 907, 85 L.Ed. at 1298, is not unlimited. *In re Ahlswede,* 516 F.2d 784, 787 (9th Cir. 1975), *cert. denied sub nom. Stebbins v. Crocker-Citizens National Bank,* 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975). It confronts two principal bounds. First equitable considerations can justify only the subordination of claims, not their disallowance. "A claim that for reasons of equity must be postponed *should be allowed,* and the postponement incorporated in the order of allowance as a qualification thereto." *Fahs v. Martin,* 224 F.2d 387, 394 n. 4 (5th Cir. 1955), *quoting* 3 J. Moore & L. King, Collier on Bankruptcy ¶ 57.14[1], at 235–36 (14th ed. 1976) (emphasis added by the court); Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L. Rev. 83, 86 (1961); *see Pepper v. Litton,* 308 U.S. at 310–11, 60 S.Ct. at 247, 84 L.Ed. at 291.[10]

■ Second, three conditions must be satisfied before exercise of the power of equitable subordination is appropriate.

---

**10.** Disallowance of claims on equitable grounds would add nothing to the protection against unfairness already afforded the bankrupt and its creditors. If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination. If the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it. *See* 3 J. Moore & L. King, Collier on Bankruptcy ¶ 57.14, at 233 (14 ed. 1976). Thus,

where the bankrupt is the victim it has an adequate remedy at law. It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44, 51 (1962); *Beacon Industries, Inc. v. Westover,* 359 U.S. 500, 506–10, 79 S.Ct. 948, 952–56, 3 L.Ed.2d 988, 994–997 (1959); 1 S. Symons, Pomeroy on Equity Jurisprudence, § 217, at 367 (5th ed. 1941).

(i) The claimant must have engaged in some type of inequitable conduct. *Comstock v. Group of Institutional Investors,* 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911, 1923 (1948); *Spach v. Bryant,* 309 F.2d 886, 889 (5th Cir. 1962); *Frasher v. Robinson,* 458 F.2d 492, 493 (9th Cir. 1972), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972).

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. *Comstock v. Group of Institutional Investors,* 335 U.S. at 229, 68 S.Ct. at 1463, 92 L.Ed. at 1923; *In re Branding Iron Steak House,* 536 F.2d 299, 302 (9th Cir. 1976); *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256, 265 (N.D.N.Y. 1968); *see Wages v. Weiner,* 381 F.2d 667, 670 (5th Cir. 1967).

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *Luther v. United States,* 225 F.2d 495, 499 (10th Cir. 1955), cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); *In re Columbia Ribbon Co.,* 117 F.2d 999, 1002 (3d Cir. 1941); *see American Mutual Life Ins. Co. v. City of Avon Park, Florida,* 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91, 95 (1940), *quoting SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293, 1303 (1940); *In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir. 1973).

■ In determining whether these three conditions are satisfied three principles must be kept in mind. The first is that inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim. The Eighth Circuit outlined the rationale supporting this rule in *In re Kansas City Journal-Post Co.,* 144 F.2d 791 (8th Cir. 1944).

[I]n dealing with creditors' claims in a bankruptcy proceeding, the "subject matter in litigation" . . . goes beyond the legal foundation and legal structure of the individual claim. For claim and distribution purposes, a bankruptcy proceeding is an integrated proceeding, and the "subject matter in litigation" in its practical aspect is the right of creditors to share in the bankruptcy assets themselves, not merely legally but in equitable relation to each other—for the assertion of a claim in bankruptcy is, of course, not an attempt to recover a judgment against the debtor but to obtain a distributive share in the immediate assets of the proceeding. *The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate* . . . .. Hence, it would seem that an improper use or appropriation of corporate assets by a fiduciary, which has occurred in reasonable proximity to the bankruptcy and while the corporation is insolvent, so that the bankruptcy results are directly affected by it, may constitute such an inequity against other creditors as to entitle the court to deal with it by appropriate and measured subordination of any claim asserted by the fiduciary against the estate, regardless of whether the appropriation is directly connected with the claim itself.

144 F.2d at 803–04 (emphasis added); *accord, L & M Realty Corp. v. Leo,* 249 F.2d 668, 672 (4th Cir. 1957). Although there is language in some cases to the effect that it is only inequitable conduct in "acquiring or asserting" the specific claim challenged that is relevant, *see, e. g., Prudence Realization Corp. v. Geist,* 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed.2d 1293, 1298 (1942); *In re Ahlswede,* 516 F.2d at 788, we are convinced that this narrow conception of what misconduct is pertinent was adopted inadvertently. Improper acts unconnected with the acquisition or assertion of a particular claim

have frequently formed at least a part of the basis for the subordination of that claim. *See, e. g., Taylor v. Standard Gas & Electric Co.,* 305 U.S. 584, 59 S.Ct. 96, 83 L.Ed. 369 (1939) (The Deep Rock Case). Moreover, we have found no case in which a federal court refused to subordinate a claim solely because, although inequitable conduct of sufficient magnitude to warrant subordination existed, the conduct was unrelated to the acquisition or assertion of the particular claim whose status was at issue.

▆▆ The second principle is that a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct. For example, if a claimant guilty of misconduct asserts two claims, each worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to $10,000, only one of his claims should be subordinated. Since the exercise of the subordination power is governed by equitable principles, *Pepper v. Litton,* 308 U.S. at 304, 60 S.Ct. at 244, 84 L.Ed. at 287; *In re Texas Consumer Finance Corp.,* 480 F.2d at 1265, and equitable relief is remedial rather than penal, *Hartford Empire Co. v. United States,* 323 U.S. 386, 435, 65 S.Ct. 373, 396, 89 L.Ed. 322, 373, *supplemented on other grounds,* 324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198 (1945), subordination of the other claim would be improper.

▆▆ The third guiding principle relates to allocation of the burden of proof. In *Pepper v. Litton,* the Supreme Court stated that, for the purpose of determining whether their claims should be subordinated to those belonging to other creditors, the dealings of fiduciaries with their corporation

are subjected to rigorous scrutiny and *where any of their contracts or engagements is challenged* the burden is on the director or stockholder not only to prove the good faith of the transaction but also

to show its inherent fairness from the viewpoint of the corporation and those interested therein.

308 U.S. at 306, 60 S.Ct. at 245, 84 L.Ed. at 289 (emphasis added); *quoted* in *DeMet v. Harralson,* 399 F.2d at 39. To constitute the type of challenge contemplated by the Court, an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety. Absent such a requirement, the wideranging inquiry authorized by the *Kansas City Journal-Post* case would place an unwarranted burden on fiduciaries by requiring them to prove the good faith and fairness of *every one* of their actions with respect to their corporation at the pleasure of the Trustee. This would be tantamount to the adoption of a rule that claims advanced by fiduciaries are invalid simply because of the nature of the relation existing between the claimant and the bankrupt. For reasons that should be obvious—among them, a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital—we have steadfastly refused to endorse such a principle. *Spach v. Bryant,* 309 F.2d at 889; *Arnold v. Phillips,* 117 F.2d 497, 503 (5th Cir.), *cert. denied,* 313 U.S. 583, 61 S.Ct. 1162, 85 L.Ed. 1539 (1941); *In re Branding Iron Steak House,* 536 F.2d at 301; Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 102 (1961). The proper rule is that

the claimant's verified proof of claim obliges the objecting trustee to come forward with enough substantiations to overcome the claimant's *prima facie* case and thus compel him to actually prove the validity and honesty of his claim.

3A J. Moore & L. King, Collier on Bankruptcy, ¶ 63.06, at 1785 (14th ed. 1976) (employing the same principle that is applicable to legal challenges raised against claims asserted by non-fiduciaries).[11] This is not to say that once the initial presumption of

---

11. ¶ 63.06, at 1785 n. 30 refers us to 3 *Id.,* ¶ 57.-13, at 224–25. There we find the following:

In bankruptcy liquidation, a claim proved and filed as required by the Act and rules amounts to a *prima facie* case.[1] It establish-

[1] *Whitney v. Dresser,* 200 U.S. 532, 15 Am. B.R. 326, 26 S.Ct. 316, 50 L.Ed. 584 . . .; *Durrance v. Collier* (C.C.A.5th Cir.), 30 Am. B.R.(N.S.) 466, 81 F.(2d) 4; . . . *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947).

validity that attaches to all claims is overcome, claims asserted by fiduciaries do not demand especially close scrutiny. *DeMet v. Harralson,* 399 F.2d at 39; *Spach v. Bryant,* 309 F.2d at 888. As the Supreme Court expressed it in *Washburn v. Green,* 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516 (1890), we must examine the conduct of fiduciary-claimants "with a large measure of watchful care." 133 U.S. at 43, 10 S.Ct. at 284, 33 L.Ed. at 522.

### III. THE ALLEGED INEQUITABLE CONDUCT

██ Since the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing the first group of claims, the district court's affirmance of that portion of his order cannot stand. But the question of whether subordination of the first group of claims would have been proper remains unresolved. So does the question of whether the district court erred in affirming the bankruptcy judge's decision to subordinate the second group of claims in their entirety. The answer to these questions depends upon whether the appellants' conduct was unfair to the bankrupt or its creditors, and upon the extent of the injury to them, if any, which resulted from any inequitable activities. For the purpose of analysis, the alleged misconduct can be divided into three classes. We will consider them serially.

### A. Initial Undercapitalization

██ The trustee contends that the "so-called debentures were really only preferred stock and not entitled to debt treatment." The bankruptcy judge agreed, and dealt with the first group of claims as if they were based upon contributions to capital rather than loans. It is important to remember that the issue is not whether the advances "actually" were loans, but wheth-

er equity requires that they be regarded as if they were something else. The Supreme Court gave this explanation in *Pepper v. Litton:*

So-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder . . . where [*inter alia*] the paid in capital is purely nominal, and capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

Though disallowance of such claims will be ordered where they are fictitious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment.

308 U.S. at 309–10, 60 S.Ct. at 246–47, 84 L.Ed. at 291. (footnote omitted). Although we spoke in terms of the subscriber's intent in *Arnold v. Phillips,* 117 F.2d 497 (5th Cir.), *cert. denied,* 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941), the intentions of the parties as evidenced by their observance of many of the appropriate formalities are irrelevant. The operative facts are knowing undercapitalization and the attendant unfairness to the creditors of the corporation. Putting the intentions of the appellants as to the nature of their advances to one side, as we must, we turn to the question whether Mobile Steel was undercapitalized from its inception.

██ The concept of undercapitalization has never been rigorously defined. Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the

---

es the debt for all purposes in the case unless the objector not only denies it but produces some evidence to the contrary.[2]

[2] *Matter of Hannevig* (C.C.A.2d Cir.), 7 Am. B.R.(N.S.) 406, 10 F.(2d) 941, *cert. den.* 270 U.S. 655, 46 S.Ct. 353, 70 L.Ed. 783 . . . .

The adoption of the Rules of Bankruptcy Procedure has not altered these principles. Rule 301(b) provides:

A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

business and other circumstances. Nor is the fact of eventual failure an appropriate test. *Cf. Automotriz Del Golfo de California S.A. DE C. v. Reswick,* 47 Cal.2d 792, 799, 306 P.2d 1, 6 (1957) (Carter J., dissenting) (disregard of corporate entity). This would be tantamount to ruling that an investor who takes an active role in corporate affairs must advance to his corporation all of the funds, which hindsight discloses it needed to survive. Instead, we think that for the purposes of determining whether claims against the bankrupt estate held by organizers or shareholders should be subordinated on the ground of undercapitalization, the amount of capitalization that is adequate is

> what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

N. Lattin, The Law of Corporations §§ 15, 77 (1971); *cf.* H. Ballatine, Corporations 302–03 (rev.ed.1946) (disregard of corporate entity); *see generally* E. Latty, Subsidiaries and Affiliated Corporations, 119–28 & 133–38 (1936). This general definition is helpful because it focuses on the culpability of the organizer-stockholders and pegs the assessment to more specific standards which do not involve open-ended quantitative questions. Foremost among the standards which the general statement suggests are the following:

> (1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;
>
> (2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*See* Rembar, Claims Against Affiliated Companies in Reorganization, 39 Colum.L. Rev. 907, 915–16 (1939).

▮ While there is no testimony in the record with respect to the first standard, there is evidence concerning the second. Before commencing operations, Mobile Steel borrowed in excess of $800,000 from an independent source. This indebtedness was secured only by inventories and trade accounts receivable. The transaction demonstrates that a substantial creditor did not view Mobile Steel's initial capitalization as deficient. Nor can it be said that the quarter million dollars of capital contributed to Mobile Steel was merely nominal. While a half million dollar capitalization would have created a more solvent corporation, no showing was made that Mobile Steel was only "two jumps ahead of the wolf" at the time of its formation, or that an amount equal to the debentures would not have been available from an independent lender. Indeed, although adequacy of capitalization is to be judged as of the time of organization, it was never even shown that a shortage of capital funds contributed to Mobile Steel's financial demise.

Today's holding is not inconsistent with the rule established by *Arnold v. Phillips,* 117 F.2d 497 (5th Cir.), *cert. denied,* 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941). In *Arnold,* our decision to subordinate some of the loan-based claims asserted by the sole organizer and subscriber of the bankrupt rested on the following three factors: (1) the undercapitalization of the enterprise, (2) the district court's finding, from the evidence submitted there, that at the time the advances were made the claimant knew that his venture was undercapitalized, and (3) the claimant's attempt to retroactively establish a preference for some of his claims by securing past advances with a deed of trust on corporate property. None of these factors is present here. Nor can *Arnold* be regarded as establishing a fixed ratio of debt to shareholder equity that would enable us to distinguish between an undercapitalized and an adequately capitalized ongoing steel fabrication concern, and which we are bound to apply here. *Arnold* was

**704**

decided on *its* facts. At most it defines the amount of capital that is insufficient for the construction and operation of a particular brewery in Texas during the depression. Beyond the specific circumstances with which it dealt, *Arnold* does not purpose to speak.

B. Mismanagement, Breach of Fiduciary Duties, and Abuse of Fiduciary Position in Connection with Mobile Steel's Purchase of the Georgia Property

 The bankruptcy judge disapproved of the role which Benjamin, Woods, and Plummer played in Mobile Steel's acquisition of the Georgia property for two reasons. First, he concluded that, in view of the bankrupt's precarious financial position at the time of approval, authorization of the purchase constituted culpable purchase mismanagement. Second, he apparently believed that the transaction had been designed to benefit the appellants and actually did so. He dismissed the appellants' principal justification for their actions, that the purchase was necessary to secure tax benefits for Mobile Steel, on the ground that the bankrupt would have had no federal income tax liability for its 1966 taxable year even if it had not purchased the Georgia property, because he determined that a large net operating loss which was available for carryover to that year together with reinvestment credits generated by purchase of other pieces of property would have sufficed to offset all of the bankrupt's capital gains and ordinary income. Although we are aware of our limited role where a district court has affirmed the findings of a bankruptcy judge, *DeMet v. Harralson*, 399 F.2d at 38; *Larkins v. Sills*, 377 F.2d 1, 3 (5th Cir. 1967), we cannot reaffirm findings of fact that are unsupported by the record.

 The bankruptcy judge's conclusion that the appellants were guilty of misman-

agement in connection with the bankrupt's purchase of the Georgia property must be rejected. Although Mobile Steel's financial difficulties on the eve of the sale were grave, there is no proof that the transaction adversely affected its financial position. While the company did sustain a slight loss of $3452.82 on the resale of the property to Jones & Armstrong, this loss was outweighed by the substantial tax advantages that resulted from the initial purchase of the property. The bankruptcy judge's reconstruction of what Mobile Steel's tax position would have been if it had not purchased the Georgia property is both inaccurate and incomplete. He reasoned that because Mobile Steel had a reinvestment credit of $23,655.00 and a net operating loss of $592,952.71 to set off against its $378,750.00 capital gain and its $208,783.05 of ordinary income, it would have had no federal income tax liability for its 1966 taxable year. This conclusion is simply wrong. Under the pre-1969 amendment version of Section 1201(a)(2),[12] Mobile Steel would have been required to compute its 1966 income tax liability on the basis of the "alternative method" outlined in Section 1201. By December 31, 1969, the date on which the purchase of the Georgia property was consummated, it was settled that Section 1201 does not permit a taxpayer to deduct its net operating losses from its capital gains before the second step in the computation of tax liability under that section is carried out. *See Weil v. Commissioner of Internal Revenue*, 23 T.C. 424 (1954), *aff'd* 229 F.2d 593 (6th Cir. 1956); *Chartier Real Estate Co. v. Commissioner of Internal Revenue*, 52 T.C. 346, 350–356 (1969), *aff'd* 428 F.2d 474 (1st Cir. 1970); *see also United States v. Foster Lumber Co.*, 429 U.S. 32, 37, 97 S.Ct. 204, 208, 50 L.Ed.2d 199, 205 (1976); *Continental Equities, Inc. v. Commissioner of Internal Revenue*, 551 F.2d 74, 77 (5th Cir. 1977). Therefore, absent reinvestment in

**12.** The old Section 1201(a) (applicable to Mobile Steel's 1966 taxable year) provided in pertinent part:

If for any taxable year the net long-term capital gain of any corporation exceeds the net short-term capital loss, then, in lieu of the

tax imposed by sections 11, 511, 821(a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

the Georgia property, or equivalent lands, Mobile Steel would have been forced to recognize and pay the tax on $355,095.00 of the McGowin-Lyons capital gain. Under the rate then applicable to capital gains that would have amounted to a tax of $88,773.75 (25% of $355,095.00). The upshot of this analysis is that by purchasing the Georgia property the bankrupt deferred nearly $90,000 of tax liability.[13] In addition, since the rule now is that the amount of net operating loss available for carryover is the amount by which that loss exceeds the sum of ordinary income and capital gains recognized in the year from which the loss is sought to be carried,[14] and because the entire amount of the net operating loss available for carryover must be used in the earliest taxable year to which it may be carried,[15] the purchase of the Georgia property preserved an additional $233,014.83 [16] of net operating losses for carryover into subsequent taxable years that would otherwise have been absorbed by the capital gain.

The fact that Mobile Steel's purchase and resale of the Georgia property yielded these tax "savings" sheds light on the appellants' reasons for authorizing them. We reject as clearly erroneous the bankruptcy judge's suggestion that the appellants engineered the transactions for their own personal gain for two reasons. First, the fact that the sale was consummated at the "eleventh hour" in the face of the impending reinvestment deadline, and the fact that the corporation had unsuccessfully attempted to purchase several other pieces of property over a period of several years, when coupled with the tax benefits actually obtained, support the notion that the appellants were acting in good faith. Second, we fail to see how the appellants could have realized, or could reasonably have believed that they might realize, any profit as a result of the sale that could not have been duplicated by selling the Georgia property to someone other than Mobile Steel. There is nothing in the record to suggest that the price which the partnership charged the bankrupt was inflated, and it is clear that the price allocated to the real estate was not. Indeed, since Ingalls, which was presumably vitally interested in the way in which the accounts between Mobile Steel and Jones & Armstrong were settled, was willing to accept the Georgia property in exchange for cancellation of the $232,912.00 receivable due to Jones & Armstrong from Mobile Steel, it is very likely that the price charged by the partnership was fair and approximated the market value of the property. In addition, by agreeing to waive its security interest in the property in order to facilitate its resale, the partnership in effect traded its substantial equity in the property for a pro rata share of the proceeds of the bankrupt estate which can reasonably be expected to yield less than 100 cents on the dollar.

This kind of behavior, which predictably resulted in a net benefit to the bankrupt and proved detrimental to the personal interest of the fiduciaries, furnishes an unacceptable basis for the subordination of their claims.

13. In the course of his testimony at the hearing held before the bankruptcy judge, Jack B. Roberts, the accountant who audited Mobile Steel's books from 1965–70, stated that prior to reinvestment the bankrupt owed approximately $62,000 in federal income taxes for its 1966 taxable year and that after reinvestment it owed none. The source of this figure and the method by which it was calculated are not disclosed by the record. Whether the proper figure is $90,000 or $60,000 is unimportant. What is significant is that the purchase of the Georgia property made it possible for Mobile Steel to postpone a large tax payable for at least three taxable years.

14. *United States v. Foster Lumber Co.*, 429 U.S. 32, 97 S.Ct. 204, 50 L.Ed. 199 (1976); *Continental Equities, Inc. v. Commissioner of Internal Revenue*, 551 F.2d at 78.

15. 26 U.S.C.A. § 172(b)(2) (Supp.1977).

16. This, rather than $236,364.83, is the amount which Mobile Steel presented as the cost of the Georgia property on its 1966 federal income tax return.

### C. Other Allegedly Inequitable Conduct

To the extent that the bankruptcy judge's decision to disallow some of the appellants' claims and subordinate others rests on the alleged initial undercapitalization of the corporation or the appellants' alleged mismanagement and abuse of their fiduciary positions in connection with Mobile Steel's purchase of the Georgia property, we have already explained why his rulings are incorrect. But since misconduct need not be claim-related in order to justify subordination, it is necessary for us to determine whether the appellants acted unfairly toward either the bankrupt or its creditors in some other respect.

The bankruptcy judge disapproved of the way the appellants behaved while at the helm of Mobile Steel. For example, he found they never intended to operate the corporation as a "legitimate steel fabricating business," but rather had "merely" wished to use its corporate shell to facilitate profitable investments in other enterprises. He characterized the appellants way of doing business as "acquiring other corporations and cannibalizing them." In addition, his description of the events underlying this case suggests that he believed that the appellants may have engaged in some conduct which was unfair to one or more of Mobile Steel's subsidiaries.

The conclusion that the appellants did not intend to operate a "legitimate steel fabricating business" is without support in the record. Mobile Steel's balance sheets for the period 1965–69 contain persuasive evidence to the contrary. During that time the bankrupt sold an average of approximately $3.8 million worth of steel each year.[17] This consistently substantial sales volume over the life of the company demonstrates that the bankrupt's steel fabricating operations transcended mere pretense. More fundamentally, however, we think that even if it is assumed that the appellants acted unfairly in all of the ways suggested by the bankruptcy judge, equitable subordination of their claims to those advanced by the other unsecured creditors still could not be justified because the Trustee has made no factual showing that any of these purported improprieties injured either Mobile Steel or its creditors.[18] Absent some such showing, his objections are formal only, and the burden of proving fairness never shifted to the appellants.

The decision of the district court is

REVERSED.

---

**17.** Net Sales 1965–69 *

| 1965 | $3,020,476.44 |
| 1966 | $4,583,274.38 |
| 1967 | $3,521,318.06 |
| 1968 | $3,951,479.59 |
| 1969 | $3,916,253.27 |

\* Figure for 1970 not available

**18.** An analysis of Mobile Steel's treatment of McGowin-Lyons and Jones & Armstrong yields a typical example of the deficiencies in the Trustee's proof. After Mobile Steel had acquired virtually all of the stock of McGowin-Lyons and Jones & Armstrong it stripped much of their capital from them by means of stock redemptions and cash dividend declarations. These incidents may have been the bankruptcy judge's basis for asserting that the appellants "cannibalized" Mobile Steel's subsidiaries. But while it is conceivable that the subsidiaries and their creditors may have been injured, such injuries cannot be redressed by the subordination of the appellants' claims to those asserted by Mobile Steel's creditors, who have not shown that *they* were harmed. For all that appears in the record, the only result of the stock redemptions and dividend declarations was to transform a portion of one of Mobile Steel's assets (investment in subsidiaries) into a different and perhaps more desirable state (cash). This is not the type of transaction against which the doctrine of equitable subordination furnishes protection.