In re ANSWERFONE, INC.,
Debtor-in-Possession.

R.C. LIMERICK and Connor
Limerick, Plaintiffs,

v.

Joe L. LIMERICK, III, Defendant,

Charles Darwin Davison,
Trustee, Intervenor.

Nos. LR83–842M, AP84–197M.

United States Bankruptcy Court,
E.D. Arkansas, W.D.

Jan. 23, 1985.

Griffin Smith, Little Rock, Ark., for plaintiffs.

David Williams, Little Rock, Ark., for debtor.

Charles D. Davidson, Little Rock, Ark., trustee intervenor.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On September 6, 1983 a state court appointed receiver for Answerfone, Inc. filed a voluntary petition for relief under the provisions of Chapter 11. Subsequently, the debtor-in-possession filed an objection to an $811,188.51 claim of Joe L. Limerick, III (Joe Limerick), and a hearing was held on January 9 and 10, 1984, before The Honorable Charles W. Baker. On February 13, 1984 Judge Baker entered an Order overruling the objection for reasons stated in the Memorandum Opinion filed on the same date. Within the time permitted by the rules, the debtor-in-possession peti-

tioned for reconsideration,[1] and that motion is still pending. Subsequently, Judge Baker resigned his office, and the undersigned was appointed on March 26, 1984. Thereafter, R.C. Limerick, Ada Limerick and Connor Limerick filed this action (AP 84–197) seeking an order subordinating the claim of Joe Limerick. Joe Limerick counterclaimed in the same action seeking to subordinate the claim of R.C. Limerick, Ada Limerick and Connor Limerick. On July 9, 1984 this Court appointed Hon. Charles D. Davidson, Trustee.

The Court heard testimony on December 3, 1984 and by agreement of the parties a transcript of the earlier proceeding was submitted for the Court's consideration in connection with the subordination case.

Answerfone, Inc. (Answerfone) is an Arkansas corporation engaged in the telephone answering service with its principal place of business in the State of Arkansas. Prior to February 1983, the stock in Answerfone was owned by R.C. Limerick and Ada Limerick, husband and wife, and Connor Limerick, their son, all of Little Rock, Arkansas. R.C. Limerick testified that Answerfone made a profit every year except for two years, one of which was 1982. The loss in 1982, though not in a significant amount, was explained as being the result of a dispute with the telephone company over some defective equipment.

In early 1983, R.C. Limerick initiated negotiations with Joe Limerick (no relation) for the sale of Answerfone. By virtue of a previous agreement, R.C. Limerick was obligated to employ Joe Limerick as a broker if Answerfone were ever put up for sale. Pursuant to this understanding, Joe Limerick undertook to find a purchaser for Answerfone. Around the 15th of February 1983, Joe Limerick and a Mr. W.N. Thompson met with R.C. and Connor Limerick in the Little Rock Hilton Hotel to discuss the possible sale of Answerfone to some prospective purchasers named Kamsler from California. The negotiations were not fruitful, and no agreement was reached with the Kamslers. The Little Rock Limericks met W.N. Thompson for the first time during these negotiations. R.C. Limerick testified that W.N. Thompson acted as a male secretary to Joe Limerick and was not a principal in any of the negotiations. R.C. Limerick further testified that W.N. Thompson was at all times an employee or servant under the control of Joe Limerick. On the other hand, Joe Limerick described Mr. Thompson not as an employee but as a principal acting independent of control by Joe Limerick. For the reasons stated herein, the Court finds that W.N. Thompson was under the control of Joe Limerick and was his employee. This is important because of subsequent events. There was very little testimony of Joe Limerick which the Court believed.

After failing to reach an agreement with the California group, Joe Limerick inquired whether a sale to him was possible. According to R.C. Limerick, Joe Limerick stated that he did not want to appear as the principal but as the broker. Consequently, it was suggested by Joe Limerick that an Arkansas corporation, Americall-Little Rock, Inc., be created with W.N. Thompson as president and the stock of Answerfone be transferred to the newly formed corporation. R.C. Limerick indicated that this was agreeable as long as Joe Limerick personally guaranteed payment of the purchase price. A written agreement was then entered into and was structured as follows:

A. Americall-Little Rock, Inc. was created. W.N. Thompson was elected president, and 2,000 shares of stock were issued in the name of W.N. Thompson. Thompson claimed to have paid $2,000.00 for the stock.

B. Americall-Little Rock, Inc. agreed to purchase all the outstanding stock in Answerfone from R.C. Limerick, Ada Ellis Limerick, and Connor Limerick for a total purchase price of $693,853.17.

---

1. It is not clear whether the motion to reconsider was brought under 11 U.S.C. § 502(j) or

Bankruptcy Rule 8015.

C. The purchase price was paid by the execution of two promissory notes by Americall-Little Rock, Inc.; one in the sum of $198,834.39, principal, with interest at the rate of 9% per annum payable to Connor Limerick in installments of $2,500.00 for 120 months, including principal and interest; the other in the principal sum of $397,-668.78, with interest at the rate of 9% per annum payable to R.C. and Ada Limerick for 120 months in installments of $5,000.00, including principal and interest. The remaining balance of $97,350.00 was apparently paid by the cancellation of a debt in that amount owed by the sellers to Answerfone. This was accomplished by the buyers' delivering a check to the sellers for $97,350.00 which the sellers simultaneously endorsed to Answerfone.

D. The promissory notes payable to the Little Rock Limericks were personally guaranteed by W.N. Thompson and Joe Limerick and were secured by a purported lien granted by Answerfone, Inc. on all of its assets.

According to R.C. Limerick, since the sale was actually a sale to Joe Limerick, no brokerage commission was due from the sellers.

Immediately after the transfer of the stock, and without notice to the Little Rock Limericks, Americall-Little Rock, Inc. and Answerfone (acting through W.N. Thompson) and W.N. Thompson, individually, executed a promissory note payable to Joe L. Limerick for $798,496.01 dated February 25, 1983, with interest at the rate of 9% per annum, payable in monthly installments of $6,000.00, including principal and interest, beginning March 8, 1983 and payable each month thereafter for 840 months (70 years). To secure this note, Americall-Little Rock, Inc. pledged all of its outstanding stock and all of Answerfone's stock to Joe Limerick, and Answerfone granted to Joe Limerick a purported lien in all of its assets. According to the testimony of Joe Limerick, this lien was perfected several months later, although he was not sure of the date. He did acknowledge that it was close to the time the bankruptcy petition

was filed. No documentary proof was introduced showing the perfection of the claimed lien to Joe Limerick, nor does any proof appear attached to his claim which is in the Court's file.

As soon as the sale was completed and the stock transferred, the debtor's financial condition deteriorated. Substantial sums of money were disbursed to Thompson personally and to several companies owned or controlled by Joe Limerick and Thompson, primarily, Americall International. The total of the unexplained payments during a period from March 1983 to August 1983 was $206,271.00. Americall-Little Rock, Inc. defaulted in its agreement to purchase some real estate in connection with the Answerfone sale, and Answerfone, with Thompson at the controls, stopped paying many of the creditors including Charles Bishop who was owed a longstanding debt, the IRS, and the phone company. When the phone company's unpaid bill exceeded $100,000.00, of course, it began trying to terminate service.

By the time the petition for bankruptcy was filed, the debtor had been denuded of cash and burdened with liens to the Little Rock Limericks and to Joe Limerick for over $600,000.00 and $700,000.00, respectively, to secure debts it did not owe. The debts for which the debtor apparently received equivalent value are listed as follows:

| | |
|---|---|
| Priority | $49,544.75 |
| Secured Creditors | $71,133.18 |
| Unsecured Creditors | $264,786.69 |

Assets are listed at $613.319.16.

I.

EQUITABLE SUBORDINATION OF
THE CLAIM OF JOE L.
LIMERICK, III

This cause is brought under the provisions of 11 U.S.C. § 510(c) of the Bankruptcy Code. This section is new and has no statutory parallel under the Bankruptcy Act. It represents, though, a codification of case law which evolved under the Bankruptcy Act. 3 *Collier on Bankruptcy*

¶ 510.01 (15th Ed.). Although the underlying theme of the Bankruptcy Act was equality of distribution, the Bankruptcy Court as a court of equity was considered to be possessed with inherent power to "prevent the consummation of a course of conduct by a claimant which would be fraudulent or otherwise inequitable by subordinating his claim to the ethically superior claims asserted by other creditors." *Matter of Mobile Steel Company,* 563 F.2d 692 (5th Cir.1977). In *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), Justice Douglas stated:

> Claimant cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements ... Where there is a violation of these principles, equity will undo the wrong or intervene to prevent its consummation.

In the case of *Matter of Mobile Steel Company, supra,* the court stated that three conditions must exist before the exercise of the power of equitable subordination is appropriate.

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

Other courts have adopted this formula. *See, Matter of Missionary Baptist Foundation of America,* 712 F.2d 206 (5th Cir. 1983); *In re Westgate-California Corp.,* 642 F.2d 1174 (9th Cir.1981); *In the Matter of Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980); *In re Bellucci,* 29 B.R. 814, 10 B.C.D. 721 (1983); *In re Wilnor Drilling, Inc.,* 29 B.R. 727, 8 C.B.C.2d 1045 (S.D.Il. 1983); *In re Washington Plate Glass Company,* 27 B.R. 550, 8 C.B.C.2d 707 (D.D.C.1982); 3 *Collier on Bankruptcy,* ¶ 510.9 (15th Ed.).

The facts in each case are, of course, of crucial importance in considering whether to subordinate a claim. Bankruptcy represents in most instances the end of the road for creditors' rights, and in many cases subordination means no distribution at all. Therefore, the power of subordination must be used judiciously. *In re Kansas City Journal-Post Co.,* 144 F.2d 791 (8th Cir.1944).

■ Applying the above quoted principles to the facts in this case, the Court is convinced that a substantial basis for subordinating Joe Limerick's claim exists. There are several factors which lead the Court to this conclusion.

The claim of Joe Limerick is not founded on any real debt owed by anyone, especially the debtor, but is based on a purported lien granted by the debtor to secure an absurdly overstated and fraudulent claim for a brokerage commission arising out of a sale of all of the stock of the debtor from the Little Rock Limericks to Americall-Little Rock, Inc. and "consulting services." The evidence is undisputed that there was no agreement by the seller to pay a brokerage commission, but rather the agreement was made between Joe Limerick's employee, W.N. Thompson, on behalf of Answerfone, Americall-Little Rock, Inc., and Joe Limerick. According to the exhibits introduced at the trial, all of the outstanding stock in Answerfone was sold for a total purchase price of $693,853.17. As a commission for this and in consideration of "consulting services," the debtor, through Thompson, agreed to pay Joe Limerick $798,496.01 in monthly installments over seventy years, together with 9% interest which amount to total payments in excess of $5,000,000.00. In the Court's view, the characterization of the consideration of this debt as a brokerage commission and as payment for consulting services is patently fraudulent.

The Court believes the testimony that W.N. Thompson was nothing more than the servant and alter ego of Joe Limerick. W.N. Thompson simply aided and abetted Joe Limerick. R.C. Limerick testified that

it was Joe Limerick, not Thompson, who offered to buy Answerfone and who requested that the buyer be a corporation whose president and sole shareholder would be Thompson. He testified that Thompson never entered into negotiations, but rather, kept notes, typed, emptied ashtrays, made long distance calls, and got coffee. Joe Limerick attempted to characterize this as "good manners." He denied that Thompson was his secretary and asserted that Thompson was a real principal in the transaction. However, Joe Limerick conceded on cross-examination that in a previously given deposition he had also characterized Thompson's position as similar to the viewpoint of R.C. Limerick. Further, the testimony of Connor Limerick corroborated R.C. Limerick's version, and even Joe Limerick admitted at the trial that right up until the transaction in question W.N. Thompson was his employee—his assistant. Thompson did not even appear at the trial. Subsequent events prove to the Court's satisfaction that W.N. Thompson was Joe Limerick's servant and alter ego. Why else would Thompson cause his corporation to pay a brokerage commission and consulting fee of $798,000.00 to Joe Limerick, payable over seventy years and secured by a lien on all company assets, if he were not told to do so by Joe Limerick since the amount of this lien far exceeded the net worth of the company? The consulting advice for which the debtor paid so handsomely was, for the most part, advice not to pay the debtor's principal and most indispensable creditor, the phone company, as well as other creditors. The debtor followed this "advice" from the moment the company was sold until the Chancery Court rescued the company by appointing a receiver. None of the so-called consulting services were ever reduced to written or printed form, and Joe Limerick's explanation of the value of these services was gobbledegook.

W.N. Thompson testified at a previous hearing that he paid $2,000.00 for all of the stock of Americall-Little Rock, Inc., but offered no documentary proof of payment. The sale of Answerfone to Americall-Little Rock, Inc. was entirely on credit, thereby enabling Thompson and Joe Limerick to gain control of this company without putting at risk any personal funds. Joe Limerick was the real purchaser of Answerfone, and he accomplished this through indirection. For instance, upon the sale of the stock of Answerfone to Americall-Little Rock, Inc., Americall-Little Rock, Inc. immediately pledged Answerfone's stock to Joe Limerick to secure the payment of the $798,496.01 note. This note was the joint obligation of Americall-Little Rock, Inc. and W.N. Thompson. Significantly, the stock pledge agreement provides that if W.N. Thompson becomes in default of the obligation, which event did in fact promptly occur, Joe Limerick could immediately assume control of Answerfone by voting the stock shares so pledged. Of course, all payments that were made on the $798,496.01 obligation were made by Answerfone and not the makers of the note. Remember, Joe Limerick was required to personally guarantee the entire unpaid purchase price which Americall-Little Rock, Inc. owed to the Little Rock Limericks. Without the guarantee, there was no deal.

Significantly, sums of cash flowed out of state to other companies which had been formerly owned by Joe Limerick and which had been recently sold to W.N. Thompson and others. These sales were similarly structured to the sale in question in that they were also secured by pledges of stock back to Joe Limerick. In the Court's view, Joe Limerick was, and is, in substance and in fact, the de facto owner of Americall-Little Rock, Inc. which owns all of the stock of the debtor. After sifting through all the myriad transactions, one finds that today Joe Limerick has in his possession or under his control all of the stock of the debtor.

Under these facts, Joe Limerick is clearly an insider, and therefore, a fiduciary, and, in an action to subordinate claims, once evidence is brought forward of the existence of inequitable conduct, the burden shifts to him to show the fairness and good faith of the purported transaction. *Pepper v. Litton, supra; Matter of Mobile*

*Steel Company,* supra; 3 *Collier on Bankruptcy,* ¶ 510.15 (15th Ed.). Stated another way, "upon the presentation of sufficient evidence to overcome the prima facie validity of a properly filed claim, the claimant is obliged to prove his good faith and fairness in the dealings. It is at this juncture that the fiduciary's claim is subject to the probing light of judicial inquiry." *Matter of Missionary Baptist Foundation of America,* supra; *Matter of Multiponics,* supra. In addition to the evidence that there was a lack of fair equivalent consideration given by the stricken debtor to Joe Limerick for the claimed lien, there was proof that the stock of the companies which inexplicably received over $206,000.00 of the debtor's cash was still in Joe Limerick's possession, and these companies are now in bankruptcy.

The evidence was scant that Joe Limerick even has a perfected secured claim. No documentary evidence of perfection was introduced, and what evidence there was consisted of the oral testimony of Joe Limerick which indicated that the purported lien remains subject to being invalidated by the trustee as a preference under 11 U.S.C. § 547 or as a fraudulent conveyance under 11 U.S.C. § 548. Furthermore, the Court has pending a motion to reconsider the validity of the claim filed by R.C. Limerick and the same motion by the trustee who was appointed after these proceedings began. The motions may well have merit.

The evidence here meets all of the requirements of *Matter of Mobile Steel Company,* supra. The conduct of Joe Limerick was fraudulent; the creditors have been injured; and Joe Limerick has attempted to cause to be conferred upon himself an unfair advantage by virtue of his insider position. It is manifestly consistent with the Code that the claims of real creditors be paid in full before claims by insiders which have no substance in fact.

The claim of Joe Limerick of $811,188.81 for reasons stated herein is subordinated to the claims of all other creditors of whatever class or priority except claims of interest, assuming the claim of Joe Limerick is not disallowed in any subsequent order. The lien purportedly securing Joe Limerick's claim is hereby transferred to the estate and is dissolved.

## II.

## CLAIMS OF R.C. LIMERICK, ADA LIMERICK AND CONNOR LIMERICK

R.C. Limerick, Ada Limerick, and Connor Limerick filed proofs of claim asserting liens on all assets of the debtor to secure a debt owed to them by Americall-Little Rock, Inc. and guaranteed by Joe Limerick. These claimants are the former owners of the debtor, and this debt represents the balance of the purchase price for the stock of Answerfone, which was sold by the claimants to Americall-Little Rock, Inc. No fair equivalent consideration for the imposition of the lien passed to the corporation, although under existing precedent, sufficient consideration did exist to support imposition of the lien. *In re Terminal Moving and Storage Co.,* 631 F.2d 547 (1980). The sellers did not secure the sale of stock in Answerfone by a pledge back, but rather asked this Court to allow them to abandon their status as former interest holders in the debtor and elevate their claim to that of a creditor.

The test for equitable subordination applies equally to these claims as it does to the claim of Joe Limerick. In the Court's view, it is inequitable to allow these claims to be paid until the creditors of the debtor are paid in full. As owners and officers of the corporate debtor, the Little Rock Limericks owed a fiduciary duty to creditors. *Pepper v. Litton,* supra; *Raines v. Toney,* 228 Ark. 1170, 313 S.W.2d 802 (1958). A corporation is an entity created under the law to facilitate business, and the proper utilization of a corporation confers substantial benefits on the owner. There is limited liability for debts and tax advantages for instance. Corporations can be, and often are, misused and abused. Abuses are not uncommon in bankruptcy and are frequently the

precipitating cause of the bankruptcy. That is the sad case here. Since the Little Rock Limericks sold the stock in Answerfone, creditors have not been paid. On the other hand, R.C. Limerick and Connor Limerick have received over $150,000.00 during these troubled times. These sums were paid by Answerfone first as payment on the note owed not by Answerfone, but by Americall-Little Rock, Inc., and, since bankruptcy, payments have been characterized as salary. Post-bankruptcy salary payments are in the exact amount of the prepetition note payments. Remember, Answerfone owed no debt to these claimants; Answerfone was made to offer its assets as security for the debts of others. Answerfone even paid the Little Rock Limericks' attorney's fee in the bitter fight to regain control of the stock. Answerfone has paid everyone else's debt whether to the Little Rock Limericks, Joe Limerick, Americall International, Americall-Houston, or W.N. Thompson. Now, it is Answerfone from whom these claimants demand payment of the full balance of Americall-Little Rock, Inc.'s debt for the sale of itself and on a priority ahead of all unsecured creditors. Clearly, the claimants here were able to secure this advantage over unsecured creditors because as owners of the stock and controlling officers of the corporation and as sellers of the stock, they could dictate the terms of the sale and the terms of the security if there was to be a sale. The effect of all of this is that the corporation is paying for its own stock, and it has been generally held that this is not permitted until after all creditors have been paid. See, McConnell v. Estate of Butler, 402 F.2d 362 (9th Cir.1968); In re Trimble Company, 339 F.2d 838 (3rd Cir.1964); Mountain State Steel Foundries, Inc. v. C.I.R., 284 F.2d 737 (4th Cir.1960); Robinson v. Wangemann, 75 F.2d 756 (5th Cir. 1935); In re Fechheimer Fishel Co., 212 Fed. 357 (2nd Cir.1914); In re Washington Plate Glass Company, supra. To structure a sale in this manner is a breach of the claimants' fiduciary duty to the creditors of the corporation.

The purported lien was transferred without equivalent fair consideration to insiders within one year of bankruptcy and, therefore, remains subject to being set aside by the trustee as a fraudulent conveyance under 11 U.S.C. § 548. In re O.P.M. Leasing Services, Inc., 40 B.R. 380 (1984); In re Chicago Music Corp., 36 B.R. 626 (1984).

■ Furthermore, the evidence before the Court is that the purported lien, if there is one [See, In re Don Miller, Inc., 35 B.R. 714 (1984)], is unperfected and subject to additional attack by the trustee under 11 U.S.C. § 544. Payment Plans, Inc. v. Strell, 717 F.2d 25 (2nd Cir.1983); In re Corsica Enterprises, Inc., 40 B.R. 769 (1984). The financing statement purportedly perfecting the lien on Answerfone's assets was given in the name of Americall-Little Rock, Inc. which only owned stock in Answerfone. Under Arkansas law, in order to perfect a lien in the inventory, equipment, fixture, contracts and accounts receivables, etc. of Answerfone, a security agreement must be executed and a financing statement properly filed of record. Ark.Stats.Ann. 85-9-302 (Admn.1961). The filing is required to be made in the office of the Secretary of State and, if the debtor has a place of business in only one county of the state, also in the office of the clerk of the Circuit Court of such county. Ark.Stats.Ann. 85-9-401. A financing statement must give the name of the debtor and be signed by the debtor. "Debtor," under these circumstances, means the owner of the collateral. In re Davidson, 738 F.2d 931 (8th Cir.1984). The only evidence in the record of perfection is a financing statement which, although recorded, is neither signed nor made in the name of the debtor, Answerfone; it is unsigned and in the name of Americall-Little Rock, Inc. See, In re B. Hollis Knight Co., 605 F.2d 397 (8th Cir.1979); In re Thomas, 7 B.R. 389 (1980).

The Court is impressed that since the filing of the bankruptcy the Little Rock Limericks have acted in a manner consistent with their former fiduciary responsibilities to creditors of this estate. I am sure part of their motivation is a desire to salvage something from an imprudent sale of the stock of this company entirely on cred-

it. There was testimony that Connor Limerick and R.C. Limerick have advanced personal funds to the debtor during the course of the administration of the estate to keep the business alive and that they have worked diligently and are presently employed by the trustee as managers of the business. Unlike Joe Limerick's claim, which the Court finds to be principally fanciful, the Little Rock Limericks are, at least, really owed money by someone, albeit not this debtor. While the Court feels that Joe Limerick's conduct was fraudulent, the evidence concerning the Little Rock Limericks is that their conduct was not.

Therefore, the claims of R.C. Limerick, Ada Limerick, and Connor Limerick are subordinated to the claims of all creditors of whatever priority, except the claim of Joe Limerick, if allowed, and the claim of holders of interest. The purported lien in favor of the claimants, R.C. Limerick, Ada Limerick, and Connor Limerick is transferred to the estate and is dissolved.

IT IS SO ORDERED.