**In re MEDICAL EQUITIES, INC., Debtor.**

**Bankruptcy No. 3–82–01498.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Dec. 31, 1987.

William R. Coen, Dayton, Ohio, for debtor.

Winn Hamrick, Ronald S. Pretekin, Coolidge, Wall, Womsley & Lombard Co., L.P.A., Dayton, Ohio, for Richard K. Skinner, creditor.

Jack J. Mayl, Dayton, Ohio, for Robert Keeler and Harry Schear, creditors.

John T. Ducker, Dayton, Ohio, Trustee in Bankruptcy.

## DECISION AND ORDER ALLOWING SKINNER CLAIM AND ALLOWING BISHOP AND COEN CLAIMS IN PART

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court upon the objection by the trustee to the claims of Richard J. Skinner (Claim # 4), J. Robert Bishop (Amended Claim # 16), William R. Coen (Amended Claim # 17) and William R. Coen (Claim # 18). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district. This is a core proceeding which the court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(B), allowance or disallowance of claims. The following opinion constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

This is a Chapter 7 case converted from a Chapter 11 after a failure to propose a confirmable plan. Hearings on objections to these claims were conducted on September 23, 1985, June 15, 1987, August 19, 1987 and September 14, 1987. The case was presented intensively in hours of testimony and introduction of over fifty exhibits, many of which consisted of file folders consisting of pages of ledgers of corporate records, bank statements and a myriad of deposit slips and cancelled checks. Counsel for all parties filed briefs on the law in October and November, 1987 raising the legal issues of objection to claims and equitable subordination under 11 U.S.C. §§ 502(a) and 510(c).

## FINDINGS OF FACTS

Medical Equities, Inc. was incorporated on August 21, 1972 by W. William Look and William R. Coen. Each of them purchased 150 shares @ $2.00 per share and served as President and Secretary–Treasurer respectively. The original purpose of the corporation was to develop a computerized diagnostic medical center. Mr. Look and Mr. Coen traveled the country endeavoring to obtain sites and financing. J. Robert Bishop became Vice President of the company in 1973 at the time of the merger of Diversified Franchises Corp. (Diversified) into Medical Equities, Inc. (Medical Equities). Mr. Bishop had advanced $18,725 to Diversified prior to the merger. The merger was not completed formally because the required increase in common stock of Medical Equities had not been authorized by the State of Ohio Division of Securities. The corporate records indicated that the merger was to be on an asset ratio basis. Diversified transferred all of its assets including over $130,000 to Medical Equities, but the shareholders of Diversified never received shares representing their interests in Medical Equities. Sometime before the merger W. William Look had acquired an option for the purchase of forty-five (45) acres of land in Greene County Ohio owned by Max J. Zink, et al. The option concerned a valuable piece of real estate located near Wright State University, which Medical Equities acquired from Robert J. Peebles, Jr. for several hundred thousand dollars payable in installments. The principals of Medical Equities encountered many problems in making the payments and with the real estate which was the subject of the option. One of the most vexing problems involved several years of litigation over Peebles' responsibility for providing a sewer line.

On May 6, 1977 Mr. Look resigned from the corporation and died within a year and a few months. Mr. Bishop assumed the presidency and William Coen continued as

secretary and treasurer thereafter. Coen and Bishop struggled to meet the option payments to Max J. Zink, the owner of the property, who required from $15,000 to $25,000 annually, payable quarterly, as payment for the continuation of the option agreement. Those payments were made continually until the option was sold in May, 1984. In 1974 Medical Equities borrowed $50,000 from Third National Bank and increased the loan to $90,000 in 1978 adding the personal guarantees of Coen and Bishop. Mr. Coen offered many individuals the opportunity to loan money to Medical Equities during the 1970's. Jane K. Hopkins in 1974, Norman A. Dohner in 1974 and Richard J. Skinner responded by loaning substantial sums to the corporation. Skinner loaned over $100,000 from 1976 to 1978. None of these claimants took collection action against Medical Equities on their respective notes after the due dates of the loans during the years preceeding the bankruptcy petition date of May 21, 1982.

All of the money borrowed was used to pay on the option to purchase the land or to repay William Coen partially for his previous large loans. Coen and Bishop agreed to contribute sums as loans in 1978 and fulfilled that agreement generally, although Coen contributed much more in loans over the next few years. D. Robert Keeler and Harry Schear in 1981 became involved in an arrangement with Coen which provided $96,500 for Medical Equities to extend the right of the option. The principals of Medical Equities estimated the value of the option to purchase to be $1,300,000, which was remarkably accurate considering the $1,315,000 eventual sale price of the option.

William R. Coen and J. Robert Bishop each advanced funds to Medical Equities for the purpose of continuing the option payments over the course of years from 1974 until the option was sold in May, 1984. After filing under chapter 11 on May 21, 1982, Coen and Bishop continued to keep the option alive. They renewed the Third National Bank note on June 21, 1982. On November 29, 1983 under pressure of foreclosure of his real estate Coen paid Third

National Bank $52,392.95 (Exhibit 9). The funds of Medical Equities were not the source of this payment. On October 15, 1985 Coen, as an officer of Medical Equities, without court authority, paid $48,610.82 (Exhibit 15) from the funds of Medical Equities to Third National Bank for payment in full. Coen and Bishop rely upon a "variable amount note" and a "modified" bank loan authorization form for the corporate authority for and proof of their loans.

Coen paid $5400 and Bishop paid $4230 to Third National in monthly payments of $600 for nearly two years until October, 1985 to apply to the Medical Equities note on which they were personally liable (Exhibit 9). Coen made a post petition payment of $6,221.02 on June 23, 1982 to Third National Bank and on October 20, 1983 Coen paid Max Zink to retain the option right for Medical Equities (Exhibit 13). On September 23, 1985 Coen tendered 69,842 shares of common stock to Skinner as payment of the Skinner notes totaling over $100,000 prior to a plan being confirmed (Exhibit G).

During the course of the hearings, the court previously allowed the following claims:

| | |
|---|---|
| Jane K. Hopkins, | $43,075.07 |
| Norman A. Dohner | 10,507.95 |
| Harry Schear | 48,250.00 |
| Robert Keeler | 48,250.00 |
| Dohner, Louis & Stephens, Inc. | 7,080.28 |
| William R. Coen for legal services | 14,747.25 |

## DISCUSSION

A. *Claim #4—Richard J. Skinner—* $174,676.72

Skinner's five promissory notes total $100,079.20, bearing interest at 14 percent from different dates in 1976 and 1978. At the hearing Skinner adjusted his total claim including interest to $174,676.72. The five promissory notes are as follows:

Exhibit B—April 29, 1976, $9,097.20 with interest at 14% per annum.

Exhibit C—May 13, 1976, $25,992.00 with interest at 14% per annum.

Exhibit D—August 22, 1976, $32,490.00 with interest at 14% per annum.

Exhibit F—December 22, 1976, $7,500.00 with interest at 15% per annum.

Exhibit E—August 21, 1978, $25,000.00 with interest at 14% per annum.

Each of the notes was due after one year and contained the provision:

"... payable on maturity or by conversion and issuance of common stock of Medical Equities, Inc. at $2.50 per share."

William R. Coen guaranteed payment of each note. Mr. Skinner's full claim for the four notes with interest is $174,676.72.

The trustee suggests that the language of the note provides the right to convert to equity without designating whether the holder of the note or the maker has the right to elect the manner of payment.

William R. Coen, for Medical Equities, tendered 69,842 shares in a futile attempt to obtain Skinner's consent to one of the amended plans of reorganization. That tender was made without the authority of the Bankruptcy Court and at a time when the shares were not authorized by the Ohio Division of Securities.

■ The Court finds it impossible to interpret the notes to provide that Medical Equities, the borrower, was authorized to offer worthless paper in payment of the notes for such substantial sums of money. The court finds that the only reasonable interpretation of the notes was that the election to accept common stock rather than cash was at the option of the holder of the notes. It is interesting, however, to note that Richard J. Skinner, the lender, who presumably controlled the drafting of the documents, accepted the option to take common stock in payment of the notes. Apparently, Skinner accepted the premise that stock in Medical Equities was or would become valuable, desirable and the possible equivalent of the substantial sums loaned at the time the notes were executed. William Coen, an officer of Medical Equities, drafted the notes and guaranteed their payment.

■ Medical Equities had no basis for tendering stock to satisfy the notes in September, 1985. The proposed plan which intended such act had not been confirmed. In addition, the Ohio Division of Securities had not authorized issuance of stock which would have provided the shares required to issue 69,842 shares.

■ The trustee suggested that the Court consider a possible set-off to this claim, a settlement between Coen and Skinner of a separate state court law suit which was settled by Coen paying $50,000 to Skinner (Trustee's Exhibit 1).

The issue of set-off or reimbursement for Coen is resolved by the provisions of the settlement release. The document (Trustee's Exhibit 1) provides that the $50,000 was paid to Richard K. Skinner for other considerations by William Coen, not Medical Equities. The document specifically states that the Coen payment "will not act as a set-off in the bankruptcy proceeding."

The court rejects the argument of debtor that Skinner's notes were paid by issuance of Medical Equities stock. The claim of Richard J. Skinner is allowed in the sum of $174,676.72.

**B. Claim of J. Robert Bishop, Claim # 16 as amended—$248,398.16**

J. Robert Bishop has served in the capacities of Vice President, President, Director and shareholder of Medical Equities. Mr. Bishop bases his claim upon loans made prior to Medical Equities incorporation in 1973 until February 25, 1982 which total, after correction of a transposition error adding $450, the total sum of $230,816.15. To that amount Bishop has added interest at 20.50 percent of $11,019.10, for a total loan balance of $241,835.25. In addition to the loan, Bishop adds to his claim an amount for expenses from May 21, 1982 through June 15, 1987 the sum of $6,562.91. His total claim is summarized in defendant's Exhibit 46 as $248,398.16.

From the evidence, including the testimony and exhibits, it is clear that J. Robert Bishop was a principal shareholder in Diversified despite his protestations to the contrary. His acts related to Medical Equities contradict his alleged status as only a lender and interested bystander. He

loaned huge sums to Medical Equities and co-signed the $85,000 corporate note at Third National Bank in 1978. He acted throughout the years as an officer, shareholder, and principal of Medical Equities.

■ Medical Equities and Diversified entered into a merger agreement on April 24, 1973 which provided that Diversified's promoters' shares, which Bishop held, were to be reduced to one-tenth of their number prior to the merger date, March 31, 1973, presumably for the purpose of making them equivalent to the shares of Medical Equities. The conversion ratio of Diversified shares into Medical Equities was to be based upon the book value of each corporation after certain adjustments. Apparently to provide time for those adjustments to be determined the new Medical Equity shares were to be issued within one year after March 31, 1973, as provided in the merger agreement contained in Skinner's Exhibit H. The merger was approved by shareholders of each corporation. In November, 1973 the officers of Medical Equities attempted to increase its capitalization from 500 shares to 5,000 shares to implement the merger by filing a securities registration with the Ohio Division of Securities in the fall of 1973. The registration application languished at the agency for failure to furnish additional required information. The delay prevented Medical Equities from carrying out the provisions of the merger agreement with respect to the distribution of stock to the shareholders of Diversified Franchise, Corp. The inability of Medical Equities to issue stock certificates for the assets of Diversified which were transferred has no significant effect upon the shareholder status of Robert Bishop. He had been a holder of promoters' shares of Diversified and was entitled to shares of Medical Equities based upon the relative book values contained in the merger agreement. Mr. Bishop is entitled to shares of Medical Equities. That part of his claim for the value of his investment in Diversified must be subordinated to the claims of unsecured creditors of Medical Equities. His investment of the sum of $18,725 in Diversified is not a proper element of his claim for loans to Medical Equities. That sum is part of the capital he held in Diversified for which he should have received Medical Equities shares. Therefore, his claim must be reduced by $18,725 and that amount subordinated to the claims for loans.

■ Although the court has no doubt that Mr. Bishop expended the sums he has identified as expenses from May 21, 1982 through June 15, 1987, the court can find no basis for reimbursement before paying creditors' claims. The $4250 he paid to Third National Bank was on his comaker liability with Medical Equity which must be subordinated to the claim of Third National Bank which will be discussed under the Coen claim # 18. There are no corporate resolutions providing for the reimbursement of directors, officers or shareholders with respect to expenses incurred for the corporate business. The expenses must be considered entrepreneurial in nature and the ordinary expenditures required to advance the corporate purposes of Medical Equities. Without specific authorization for payment, these expenses must be treated as an investment in the company. This part of Bishop's claim must also be subordinated to the claims for loans to Medical Equities.

■ The Bishop claim relies upon defendants' Exhibit 8, the computer printout containing variable interest rates to arrive at the sum of $230,366.15 without the $450 transposition error. Further, the claim is based upon the "variable" note dated June 18, 1974, (defendant's Exhibit 5). The note is payable on demand for the net amount of loan at the time of demand with interest at 14 percent per annum or at such other rate as may be agreed to, from time to time, by the Board of Directors of Medical Equities. The corporate resolution dated August 1, 1978 (Exhibit 7) provides for interest at 14 percent per annum or four per cent over the prime rate as set by Third National Bank, whichever is higher, on loans from principals of the corporation.

■ The computer printouts, (Exhibits 6 and 8), were produced in 1984. They provide for interest of more than 14 percent

for "loans" in 1974 and 1975, long before the Board of Directors passed the resolution authorizing higher interest in 1978. The evidence is unclear as to whether the interest calculations are by simple or compound interest. The court disallows compounding of interest on this or any claim. The computer printouts are so vague on the method of the computation of interest as to be unintelligible in the present form. No evidence proves the method of calculation. Therefore, the defendants' Exhibit 8, as well as Exhibit 6, the computer printout for the Coen loan, have no validity to establish the balance due on the loans. However, the computer printouts are helpful in establishing the advancements to Medical Equities by Bishop and Coen and the repayments to Coen. The court will allow the claim for loans made at 14 percent simple interest to the date of the petition for the purpose of determining the amount of the Bishop and Coen claims.

Deducting the $18,750 Bishop investment in shares of Diversified and his claim of $6,562.91 for expenses, the court finds that J. Robert Bishop made the following loans to the corporation which shall be allowed as the *principal* due on his claim:

| | | | |
|---|---|---|---|
| 6–17–74 | $2,000 | 8–22–77 | 500 |
| 8–20–74 | 5,000 | 9–22–77 | 300 |
| 12–18–74 | 2,000 | 10–15–77 | 3,500 |
| 4–16–75 | 1,500 | 11–26–77 | 1,380 |
| 7–21–75 | 6,000 | 1–24–78 | 5,100 |
| 11–22–75 | 1,350 | 6–01–78 | 3,500 |
| 12–23–75 | 2,000 | 8–01–78 | 855 |
| 10–12–76 | 2,000 | 7–20–79 | 6,500 |
| 11–12–76 | 400 | 8–15–79 | 3,000 |
| 12–18–76 | 3,000 | 9–29–80 | 5,000 |
| 4–26–77 | 2,000 | 10–31–80 | 9,688 |
| 7–16–77 | 1,400 | 11–08–81 | 5,000 |
| 7–19–77 | 2,000 | 2–11–82 | 2,250 |
| 7–23–77 | 500 | TOTAL | $78,673 |

Counsel for Richard J. Skinner and the trustee have strongly advocated that the claim of J. Robert Bishop along with that of William R. Coen should be subordinated to the claims of the other claimants who have loaned money to Medical Equities or provided funds for the preservation of the sole asset of Medical Equities to the time of its sale.

The leading case on the issue of equitable subordination is *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977). The court recited the fundamental principle and purpose of bankruptcy which is equality of distribution citing *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952). The court noted that the bankruptcy courts are regarded as courts of equity, citing *Local Loan Company v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934), so that bankruptcy courts possess the power "to prevent the consummation of a course of conduct by a claimant which ... would be fraudulent or otherwise inequitable by subordinating his claims to the ethically superior claims asserted by other creditors," citing *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946), and *Pepper v. Litton*, 308 U.S. 295, 304–05, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939).

The law requires more than "insider" status of a claimant to invoke the doctrine of equitable subordination.

The Bankruptcy Code of 1978 codified the case law of equitable subordination in 11 U.S.C. § 510(c)(1). That section provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

The legislative history recites the following:

To date, under existing law, a claim is generally subordinated only if holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor. 124 Cong.Rec. 11,095 (Sept. 28, 1978); 124 Cong.Rec. S17,412 (Oct. 6, 1978).

The elements required for equitable subordination of a claim are well defined in *In re Mobile Steel Co.* as follows:

(i) the claimant must have engaged in some type of inequitable conduct. (Citations omitted)

(ii) the misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant. (Citations omitted)

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy act (Citations omitted)

563 F.2d at 700.

■ The doctrine of equitable subordination as used in bankruptcy is applicable to prevent a claimant who has committed fraudulent or other inequitable acts from gaining advantage over or equality with other claimants. A claimant's status as an insider alone is insufficient to invoke equitable subordination to a claim held by an insider. Courts require proof of the inequitable act, injury to the other creditors and consistency with bankruptcy. The Court in the leading case of *In re Mobile Steel Company, supra,* found subordination was not warranted where capitalization of $250,000 was not proved to be undercapitalization for a steel fabricating company and mismanagement. As a result organizers', officers' and directors' claims were treated equally with other creditors. The court further held that the purported improprieties did not injure either the corporation or its creditors. In the case of *In re Micro-Acoustics Corp.,* 34 B.R. 279, 11 B.C.D. 186 (Bankr.S.D.N.Y.1983), the court held the loan claim of a former principal and shareholder should not be subordinated because no compelling reason was shown for classifying a claim of a shareholder differently from other unsecured creditors. In the case of *In the Matter of Rego Crescent Corp.,* 23 B.R. 958, 9 B.C.D. 867 (Bankr.E.D N.Y.1982), the loan claims of a trust and son of shareholders were not subordinated because the advances could not be construed as contributions to capital nor was there evidence of inequitable conduct. In the case of *In the Matter of Frasher's, Inc.,* 458 F.2d 492 (9th Cir.1972), the court of appeals held it was error to subordinate loan and management claims of a majority shareholder absent a showing of inequitable conduct such as fraud or overreaching.

An example of proper application of equitable subordination is *In re Answerfone, Inc.,* 48 B.R. 24, 12 B.C.D. 1233 (Bankr.E.D.Ark.1985) where a broker's sales commission for $700,000 was subordinated to claims of former owners because purchaser's president signed a note for the commission secured by a pledge of stock and granted a lien on all debtor's assets when broker was a principal in the transaction.

■ In this case, the conduct of Bishop in advancing money to the corporation to provide funds to conserve the option can hardly be construed as inequitable. The money advanced preserved the valuable option right and Bishop received no security or advancement over other loan claimants. The money advanced was not injurious to the rights of other creditors. The money advanced was recorded on records kept by Mr. Dohner, the accountant, in a ledger column for Robert J. Bishop marked "loans" as part of Exhibit 36. The corporate Federal income tax returns show "stockholder loans" in increasing amounts on the balance sheet from 1972 until 1979 (Exhibit 29 and 36). The Ohio Personal Property tax returns list notes payable in amounts up to $494,808.91 in the 1980 balance sheet, form 921, (Exhibit 36). These documents, although secondary to loan source documents, support the large loan of Bishop and Coen at a time when the corporation's survival was not in doubt. These tax records have an independent degree of credibility as business records.

The capitalization of Medical Equities was shown to include the assets transferred from Diversified including $130,000 in cash. Significantly the Federal and Ohio tax returns listed the common stock as being worth $62,100. These facts support the testimony of John Gogle that the capitalization for Medical Equities was adequate for its corporate purpose.

Bishop's advances were loans authorized by corporate resolution (albeit, in summary form on the revised bank loan authorization form, Exhibit 24) and evidenced by the

variable amount promissory note of June 18, 1974. The note is clearly non-negotiable, but is valid as an obligation between Medical Equities and Bishop. For these reasons, the court finds no grounds for subordinating the claim of Bishop to the claims of the other claimants herein.

A close scrutiny of the conduct of Bishop makes it apparent to the court that, acting as a principal, Bishop advanced funds to the corporation throughout the years to keep the sole asset of the corporation alive. The effort was finally successful after bankruptcy when the option was sold for $1,315,000. Bishop's conduct was reasonable and responsible considering all of the circumstances. He and Coen, the principals of Medical Equities continued to loan money to the corporation long after other unsecured creditors. Bishop loaned money to to keep the corporate asset from disappearing. His loans, with Coen's, contributed to maintaining the option until it could be turned into a liquid asset which is a benefit to all creditors.

Bishop's investment in Medical Equities is traced from his investment in the merged corporation, Diversified. His investment of $18,725 in Diversified is supported by cancelled checks (Exhibit 43) which flowed by the merger into Medical Equities. Although he has not yet received a stock certificate representing his investment in Medical Equities, he has shareholder status. His claim for loans should be treated equally with the claims of the other unsecured creditors.

The mere fact that Bishop is a shareholder and an insider does not preclude him from having a legitimate claim for loans to Medical Equities. The absence of inequitable conduct on Bishop's part negates the first element required for subordination of his loan claim to claims of other creditors. *Frasher v. Robinson*, 458 F.2d 492, 493 (9th Cir.1972) *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). Bishop's actions at the time of making the loans were not prejudicial to the claims of the other lenders. Far from injuring other claimants, his loans helped, as did theirs, to preserve the asset of Medical Equities until it could be sold. The loan claim is allowed in the principal amount of $78,673 to which may be added *simple* interest to be calculated and proved to the satisfaction of the Trustee within fifteen (15) days. The bankruptcy purpose of providing equality of distribution to allowed claims should be carried out in this case.

### C. *Claim of William R. Coen, Claim # 17 as amended—$333,127.27*

William R. Coen was a shareholder, director, secretary, treasurer and acted as attorney for Medical Equities from the date of its incorporation in 1972. Although acting in all those capacities, which raise questions of possible conflicts of interest, there has been no showing that Coen acted other than in the best interests of the corporation, its creditors and shareholders throughout the life of the corporation. At worst, pressed by the apparent corporate needs of an entrepreneurial nature, he neglected completing legal details concerning the merger of Medical Equities with Diversified. Also, he may be criticized for the fulfillment of only the bare minimum of legal requirements for authorization of loans from shareholders and repayments to himself for money loaned. There has been no showing that his conduct in loaning to Medical Equities was injurious to the claims of other creditors who also loaned money to the corporation. Although he reduced his loans at times over the years, the net principal due is $175,762.15, which shows his great effort to make Medical Equities a success.

Coen bases his loan claim upon the corporate resolution for accounts and loans dated August 31, 1973 (Exhibit 24), and a promissory note of April 29, 1974, for variable amounts (Exhibit 3). He loaned money to the corporation until the filing of the bankruptcy petition on May 21, 1982. After the petition he paid Third National Bank $6221.02 on June 23, 1982 upon the note he had co-signed. He also relies upon a computer printout (Defendant's Exhibit 6) as a summary of all of the advancements made to Medical Equities and repayments from July 23, 1973 to June 23, 1982. The

printout summarizes the checks and other evidence of payments contained in the numerous other exhibits supporting his claimed loans. It is clear from the work papers of the corporation held by Norman A. Dohner, C.P.A., that the advancements made by Coen from the inception were treated as loans, although the exact amounts do not coincide identically with the checks and deposit slips of the checking account of Medical Equities. The court finds that the amounts of the Coen loans are established by the deposit slips, check register, checks, and other corporate records.

■ The trustee seriously questions the amount of the loans and suggests that Coen's claims should be subordinated to the claims of other creditors under 11 U.S.C. § 510(c)(1). Counsel for Richard K. Skinner joined the trustee in the demand that the Coen claim as well as the Bishop claim should be subordinated to the claims of all other claimants of Medical Equities.

All of Coen's capacities in relation to Medical Equities leave no question that Coen was an "insider," pursuant to 11 U.S.C. § 101(30). The issue to be determined is whether the acts of William R. Coen as an "insider" were of such a nature that his claim should be equitably subordinated.

For the same legal reasons as stated at length under the J. Robert Bishop claim, the Court does not find a basis for equitable subordination. Coen's loans to the corporation, as did Bishop's loans, preserved the valuable option right which was ultimately sold for $1,315,000. The annual requirement to pay Max Zink $15,000 to $25,000 to extend the option right made it imperative that someone provide Medical Equities the funds to extend the option. All of the creditors furnished funds for this purpose, including Coen and Bishop.

Coen, unlike Bishop, received payments on his loans throughout the period. During the year immediately preceding bankruptcy Coen was repaid $6,300 as evidenced by the computer printout. During the same period he loaned the corporation $33,700. Medical Equities' checkbook (Joint Exhibit I) shows a repayment to William R. Coen of $25,000 on October 20, 1981 and $5,000 on November 9, 1981 with a replacement check on December 9, 1981 for the $5,000 payment. A spot examination and correlation between deposit slips and the computer printout verifies that the computer printouts (Defendant's Exhibits 6 and Defendant's Exhibit 8) apparently accurately reflect the third column (Loans/Withdrawal) figures on each of the computer printouts.

■ Since Coen was preferred in repayments during the year before the filing of the petition, by the October 20, 1981 payment of $2500 and the November 9, 1981 payment of $5,000 according to the checkbook and $1,300 shown on the computer printout, the Trustee may have grounds to avoid those transfers as preferential in an adversary proceeding pursuant to § 547. However, in determining allowances of claims the question of preference is beyond the scope of the proceeding. The $2500 repayment on October 20, 1981 is not shown in the computer printout. The check for the $2500 cleared The Third National Bank checking account of Medical Equities on October 22, 1981 after a deposit of $7500 on October 21, 1981. The Court is persuaded that the $2500 check was "change" from a Coen check of $7500 leaving his net loan on that date at $5000. This transaction is consistent with Coen's testimony that often he reduced his loan when Bishop later sent his contribution to the loan.

■ While the authorization for loans contained in the "modified" bank resolution for borrowing (Exhibit 24) does not specifically provide for loans from shareholders, the court considers this abbreviated authorization sufficient generally to authorize the corporation to borrow from shareholders. Coen and Bishop made the loans which benefitted the corporation and no other creditor was injured by those loans.

■ Counsel for Skinner maintains that the capitalization of the company at $600 was far insufficient to support the goals of the company. That contention has merit

except Medical Equities had other capitalization. Counsel for Skinner has not recognized the assets and capitalization received from the Diversified merger. As noted under the Bishop claim, tax returns reported capital at $61,200 for 1978 and 1979 (Exhibit 29 and 36).

In response to this assertion, John Gogle, an independent certified public accountant, testified there is no typical ratio for equity to debt for all corporations or even typical land development corporations. The balance sheet for all federal income tax purposes from 1974 to 1979 showed common stock of $61,200 and paid in capital of $500 (Exhibit 29 and 36). The accountant noted that the capitalization appeared proper for Medical Equities because it had no need for equipment, salaries or inventory. Debt provided the funds to continue the business. His review of the corporate documents, income and franchise tax returns and financial statements shows support for loans by listing shareholders loans of $17,-000 in 1974 increasing to $147,000 in 1979. He based this conclusion upon the work papers of the corporation which have been in the possession of Mr. Dohner and corporation checks in evidence.

The court has inspected closely Exhibit 36 of Dohner's work records marked "N/P" for Coen, Look, Dohner, Skinner, Bishop, and Pardieck a.k.a. Hopkins. It is consistent with other evidence that those individuals had notes payable and the loan column on each of those ledger accounts carried the entry of the principal of the loan. The balance column contained the cumulative balance due on the loan. The balance sheet in the Federal Income Tax Return for 1979, the last tax return in evidence, shows loans from shareholders of $147,231.41. These independent documents lead the court to the conclusion that the accountant of the corporation and the shareholders considered the advancements made to Medical Equities to be loans. Coen obtained no advantage over other lenders in his dealing with the corporation except for the repayments, which merely reduced somewhat his astounding loan balance. Coen was unsecured as were all others.

Since the purpose of the corporation originally was the development of the land on which the option existed, there was no imminent need for large equity capitalization. There were no salaries or other operating expenses necessary to require a capital account. The goal of the corporation could be accomplished by borrowing, if the corporate officers could find lenders. The officers and the claimants in this case were bona fide lenders to Medical Equities who met the corporate cash need for payments on the option.

The court holds that Coen has a claim based upon all the documentation, including the variable amount "promissory note," the authorization to borrow dated August 31, 1973 and the corroborating income tax returns, franchise tax reports and ledgers maintained by Dohner.

The exact amount of Coen's claim is another question. The claim is supported partially by Exhibit 6, the computer printout, which is helpful although it contains some minor inconsistencies from the deposits and checks. There are inaccuracies with respect to interest calculation, also. No witness knew if the interest was compounded in calculating the balance shown on the printout. The printout is useful to the court as a summary of the checks and deposits to the checking account for the loans made and the net amount of loans, but is deficient in determining the interest due on those principal sums. Mr. Dohner's testimony is persuasive that Exhibit 6 was consistent with his records in showing a "netting out" of loans and repayments to Coen. (Exhibit 64 and 41)

With respect to the subordination of the Coen claim, the reasoning justifying refusal to subordinate the Bishop claim is applicable here with exceptions which will be noted. Although Coen and Bishop were risk takers, and shareholders, their loan claim is as valid as the other claimants unless there was inequitable conduct in their dealings. This court finds that there has been insufficient evidence to demonstrate inequitable conduct by Coen. His continual transfer of loaned funds to Medi-

cal Equities was an effort to salvage something for himself and other creditors from the option sale. He did not attempt to gain an advantage over the other lenders by securing his claim or committing other inequitable conduct.

As to Coen's claim No. 17, the court finds that his conduct was not of the nature to be characterized as inequitable. Nothing he did resulted in injury to the other creditors' claims which would warrant equitable subordination under the elements for subordination contained in *In re Mobile Steel Co.*, 563 F.2d at 699–700.

The case of *Matter of Missionary Baptist Foundation of America*, 818 F.2d 1135, 16 C.B.C.2d 1461 (5th Cir.1987), follows the three prong test of *In re Mobile Steel Co.*, *supra*. The *Missionary Baptist* case in reversing the lower court's subordination of a claim demonstrates the necessity for clear evidence of inequitable conduct causing injury to other creditors or conferring some unfair advantage upon the claimant. The trustee in the case *sub judice* has not met the burden of proof of the elements required.

Except for repayments of certain loans to Coen, his loans remaining unpaid deserve equal treatment with all other loans to the corporation. All of the loans contributed to the preservation of the option right.

The amount of Coen's claim with simple interest must be provided to the court in the form of an intelligible figure. For this purpose Coen's payment of $6221.02 made post petition to Third National Bank must be subordinated to the claim of Third National Bank as is explained in the consideration of Coen's claim # 18. This amount must be deducted from claim # 17 at this time.

■ The court finds that Coen's claim to May 21, 1982 is allowed in the principal amount of $175,762.15. With respect to the interest which may be claimed, the court finds that there was a failure of proof by Coen as well as Bishop in establishing the interest rate at Third National Bank for use in varying the interest above 14 percent. The paper labeled "Prime rate" (Exhibit 14) was not identified, authenticated, or verified by a custodian. It is hearsay which can not be accepted as credible evidence. Therefore, the interest rate to be used for the loans of Coen and Bishop is 14% annual simple interest.

Coen, along with Bishop, is granted fifteen (15) days within which to provide the court and the Trustee simple interest calculated upon the allowed loan principal of $175,762.15. On the Coen claim the principal of those loans will include all of the entries on the computer printout less all the repayments excepting the $6221.02 entered on June 23, 1987. The first advance of $8,700.00 on July 23, 1973 is considered ratified as a loan by the resolution for borrowing completed thirty (30) days later.

D. *Claim No. 18, William R. Coen— Amended* to $58,042.95 (Third National Bank note)

■ This claim by William R. Coen is for the payment on November 29, 1983 by Coen to Third National Bank in the amount of $52,392.95 on Medical Equities' loan from Third National Bank personally guaranteed by William R. Coen and J. Robert Bishop, (Exhibit 9). In addition, Coen paid $5,400 supported by nine (9) checks to Third National Bank on the same obligation and $250 to Max Zink for Medical Equities, (Exhibit 13). The payment to Max Zink on October 20, 1983 is a valid claim for preservation of the valuable option of Medical Equities and will be allowed in full as an administrative claim.

■ Coen's payments of $52,392.55 and nine monthly payments of $600 each to Third National Bank for a total claim of $57,792.95 benefitted not only Medical Equities but also Coen and Bishop. The payments were made to satisfy Coen's and Bishop's personal liability as comakers on the note. Although Coen contends that these payments are entitled to a "priority" status ahead of other unsecured creditors, he cites no supporting authority. Apparently he maintains that the loan payments constitute an administrative claim. The claim clearly does not fall within the Bank-

ruptcy Code's provisions for administrative expenses. *See* 11 U.S.C. § 503.

During October 1985 Coen transferred $48,610.82 of Medical Equities' funds to Third National Bank without court authority. Because of the payment Third National Bank assigned a judgment it had previously taken against Medical Equities to Coen and Bishop. As a result, Third National Bank received an improper post-petition distribution of funds from the bankruptcy estate of Medical Equities. Originally, Third National Bank filed a proof of claim in the amount of $84,830. In effect, the payment to Third National Bank represents an early distribution of its dividend. To the extent, however, that the early distribution was greater than Third National Bank would have received under the normal distributive provisions of the Bankruptcy Code and the amount of interest attributable to that distribution for a two year period, the estate has been harmed and Coen is liable for that amount. If Third National Bank had received a proper dividend of $48,610.82 there would have remained an unpaid balance of $36,219.18 on the claim of Third National Bank. Although Coen paid a total of $57,792.95, any amount over $36,219.18 represented interest accruing on the note and is not allowable under 11 U.S.C. § 502(b)(2).

Under the Bankruptcy Code, an entity that is liable with a debtor on a claim of a creditor against the debtor, and pays the claim, may be subrogated to the rights of the original creditor to the extent of the payment, or may elect to file a claim in his own right for reimbursement or contribution. 11 U.S.C. §§ 509 and 502(e). He may not, however, assert his claim under both procedures. Whether Coen is seeking reimbursement or contribution for his payment of $36,219.16 to Third National Bank or asserting the rights of Third National Bank pursuant to subrogation is not clear. But under either alternative the court is required by Section 509(c) of the Bankruptcy Code to subordinate his claim to that of Third National Bank until the bank has been paid in full:

The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

11 U.S.C. § 509(c)

## CONCLUSION

In accordance with the foregoing, the court orders the following:

Claim # 4 of Richard J. Skinner is allowed in the amount of $174,676.72. Claim # 16 of J. Robert Bishop is allowed in the principal amount of $78,673 plus 14% simple interest to May 21, 1982, if the interest calculation is provided to the satisfaction of the trustee within fifteen (15) days. Claim # 17 of William R. Coen is allowed in the principal amount of $175,762.15 plus 14% simple interest to May 21, 1982, if the interest calculation is provided to the satisfaction of the trustee within fifteen (15) days. If the correct simple interest is not calculated and given to the trustee within fifteen days, the claims are allowed in their principal amounts only. Claim # 18 of William R. Coen is subordinated to the constructive claim of Third National Bank of $84,830.25 less the Coen payments to principal of $36,219.18. The trustee shall calculate the dividends for all claims, which may require an algebraic formula. Coen's Claim # 18 will participate in the dividend only if Third National Bank's constructive dividend is more than $48,610.82 (the amount of the early unauthorized payment). If the dividend is higher, Claim # 18, being subrogated to the bank's claim, shall receive the excess over $48,610.82. If the dividend is lower, Claim # 18 shall not participate and Coen's other claim shall be charged with the difference between $48,-610.82 and the lower dividend.

IT IS SO ORDERED.